## HELIOS & MATHESON NORTH AMERICA INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table summarizes the status of the stock options outstanding and exercisable at December 31, 2006:

**Stock Options Outstanding**

| Exercise Price Range | | Weighted Average Exercise Price | Number of Options | Weighted-Remaining Contractual Life | Number of Stock Options Exercisable |
|---|---|---|---|---|---|
| $0.00 | - $ 4.80 | $ 3.075 | 107,156 | 4.3 years | 62,906 |
| $4.80 | - $ 9.60 | $ 5.878 | 74,000 | 4.7 years | 27,000 |
| $9.60 | - $14.40 | $ 9.620 | 500 | 3.6 years | 500 |
| $14.40 | - $19.20 | $ 15.504 | 7,750 | 2.9 years | 7,750 |
| $24.00 | - $28.80 | $ 28.000 | 250 | 2.0 years | 250 |
| $28.80 | - $33.60 | $ 30.000 | 250 | 1.8 years | 250 |
| | | | **189,906** | | **98,656** |

At December 31, 2006, the Company had 460,000 shares of common stock reserved in connection with the Stock Option Plan.

## 15. EMPLOYMENT AGREEMENT OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER

The Company has entered into an employment agreement with Shmuel BenTov, its Chairman, Chief Executive Officer and President, which terminates on March 31, 2008. The contract calls for a salary of $360,000 per year. His employment agreement contains non-competition, non-disclosure and non-solicitation covenants. It also contains an annual bonus, subject to the approval of the non-employee members of the Company's Executive Compensation Committee and further subject to the Company meeting certain financial performance criteria, in an amount to be determined by the non-employee members of the Committee. In the event that he is terminated by the Company, he is to receive severance pay that is two times his then annual salary and is payable within 30 days of the termination.

The Company has entered into an employment agreement with Salvatore M. Quadrino, its Chief Financial Officer and Secretary, which terminates on April 30, 2008 and is set to automatically renew for subsequent one-year terms, unless and until terminated by either party upon 30 days notice. The contract calls for a salary of $180,000 per year, a discretionary annual bonus, participation in the Company's stock option plan with an initial grant of 20,000 options to purchase shares of the Company's common stock and use of a Company car. In the event he is terminated by the Company during the initial term, he is to receive severance pay in an amount equal to twelve months of his then annual salary and all granted options become vested and exercisable.

## 16. SALES AND CONVERSION OF PREFERRED SHARES

All outstanding shares of the Company's Series A and Series B Preferred Stock were fully converted into common stock during 2005. As a result, there were no outstanding shares of Series A or Series B Preferred Stock as of December 31, 2006 and December 31, 2005, respectively.

## 17. SUBSEQUENT EVENTS

On January 29, 2007, the Company entered into a professional services agreement with IonIdea, Inc. to provide certain professional services and equipment to the Company and its wholly owned subsidiary TGS. Kishan Grama Ananthram, a member of the Company's Board of Directors, is the Chief Executive Officer of IonIdea and Mr. Ananthram and his spouse own all of the outstanding capital stock of IonIdea. The term of the professional services agreement is effective as of June 27, 2006 and expires on June 30, 2007.

F-19

**HELIOS & MATHESON NORTH AMERICA INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On January 30, 2007, the Company officially changed its name from The A Consulting Team, Inc. to Helios & Matheson North America Inc. On January 31, 2007, the Company's common stock began trading under its new symbol "HMNA".

On March 26, 2007, Helios & Matheson Parent granted the Company a non-exclusive right to use the name "Helios & Matheson" and related trademarks, service names and service marks.

F-20

**HELIOS & MATHESON NORTH AMERICA INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**18. QUARTERLY RESULTS (UNAUDITED)**

The following is a summary of the quarterly results of operations for the years ended December 31, 2006 and 2005.

| | Quarter Ended | | | |
| | March 31, 2006 | June 30, 2006 | September 30, 2006 | December 31, 2006 |
|---|---|---|---|---|
| *(in thousands, except per share amounts)* | | | | |
| Revenues | $5,911 | $6,738 | $5,971 | $6,320 |
| Gross profit | 1,612 | 1,813 | 1,805 | 2,041 |
| (Loss) income from operations | (140) | 683 | 4 | 353 |
| Net (loss) income | (139) | 682 | 12 | 297 |
| Net (loss) income per share | | | | |
| Basic | $(0.06) | $ 0.29 | $ 0.01 | $ 0.12 |
| Diluted | $(0.06) | $ 0.28 | $ 0.01 | $ 0.12 |

| | Quarter Ended | | | |
| | March 31, 2005 | June 30, 2005 | September 30, 2005 | December 31, 2005 |
|---|---|---|---|---|
| Revenues | $6,115 | $6,704 | $6,858 | $6,755 |
| Gross profit | 1,875 | 1,783 | 1,900 | 2,242 |
| (Loss) income from operations | (257) | (543) | 133 | 206 |
| Net (loss) income | (259) | (546) | 118 | 203 |
| Net (loss) income per share | | | | |
| Basic | $(0.12) | $(0.24) | $ 0.05 | $ 0.09 |
| Diluted | $(0.12) | $(0.24) | $ 0.05 | $ 0.08 |

F-21

# HELIOS & MATHESON NORTH AMERICA INC.

## SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS

| Col. A | Col. B | Col. C Additions | | Col. D | Col. E |
|---|---|---|---|---|---|
| | | (1) | (2) | | |
| Description | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts Describe | Deductions - Describe | Balances at End of Period |
| Reserves and allowances deducted from asset accounts: | | | | | |
| For the year ended December 31, 2006 | | | | | |
| Allowance for doubtful accounts | $320,804 | $141,548 | $— | $(236,611) (a) | $225,741 |
| For the year ended December 31, 2005 | | | | | |
| Allowance for doubtful accounts | $296,828 | $ 35,000 | $— | $ (11,024) (b) | $320,804 |
| For the year ended December 31, 2004 | | | | | |
| Allowance for doubtful accounts | $305,290 | $145,000 | $— | $(153,462) (c) | $296,828 |

(a)   Uncollectible accounts written off during 2006.

(b)   Uncollectible accounts written off during 2005.

(c)   Uncollectible accounts written off during 2004.

S-1

## EXHIBIT INDEX

| Exhibit Number | Description of Exhibits |
|---|---|
| 3.1 | Restated Certificate of Incorporation of the Registrant. |
| 3.2.1 | Certificate of Amendment of the Certificate of Incorporation of the Registrant dated August 8, 2002. |
| 3.2.2 | Certificate of Amendment of the Certificate of Incorporation of the Registrant dated November 12, 2002. |
| 3.2.3 | Certificate of Amendment of the Certificate of Incorporation of the Registrant dated January 5, 2004. |
| 3.2.4 | Certificate of Amendment of the Certificate of Incorporation of the Registrant dated January 30, 2007. |
| 3.3 | Amended and Restated By-Laws of the Registrant, incorporated by reference to Exhibit 3.3 to the Registration Statement on Form SB-2 as previously filed with the SEC on August 6, 1997. |
| 3.4 | Amendment No. 1 to the Amended and Restated Bylaws of the Registrant incorporated by reference to Exhibit 3.4 to the Form 10-Q for the period ended June 30, 2003, as previously filed with the SEC on August 14, 2003. |
| 4.1 | Specimen Common Stock Certificate. |
| 10.1.1 | Amended and Restated 1997 Stock Option and Reward Plan, incorporated by reference to Annex J to the Company's Definitive Proxy Statement, as previously filed with the SEC on June 27, 2005. |
| 10.1.2 | Amendment No. 1 to the Registrant's Amended and Restated 1997 Stock Option and Award Plan, incorporated by reference to Exhibit 10.2 on Form 8-K, as filed with the SEC on June 9, 2006. |
| 10.1.3 | Amendment No. 2 to the Registrant's Amended and Restated 1997 Stock Option and Award Plan. |
| 10.1.4 | Form of Restricted Stock Award Grant and Notice Agreement between the Registrant and each of its Non-Employee Directors, incorporated by reference to Exhibit 10.9 to the Form 10-Q for the nine months ended September 30, 2005, as previously filed with the SEC on November 14, 2005. |
| 10.1.5 | Form of Non-Qualified Stock Option Agreement between the Registrant and each of its Non-Employee Directors incorporated by reference to Exhibit 10.10 to the Form 10-Q for the nine months ended September 30, 2005, as previously filed with the SEC on November 14, 2005. |
| 10.2 | Amended and Restated Loan and Security Agreement between the Registrant and Keltic Financial Partners, LP, dated March 23, 2004, incorporated by reference to Exhibit 10.2 to the Form 10-K for the year ended December 31, 2003, as previously filed with the SEC on March 29, 2004. |
| 10.2.1 | First Modification dated March 23, 2005 to the Amended and Restated Loan and Security Agreement, incorporated by reference to Exhibit 10.2 to the Form 10-Q for the first quarter ended March 31, 2005, as previously filed with the SEC on May 12, 2005. |

| Exhibit Number | Description of Exhibits |
|---|---|
| 10.2.2 | Amendment dated December 1, 2005 to the March 23, 2004 Amended and Restated Loan and Security Agreement incorporated by reference to Exhibit 10.2.2 to the Form 10-K for the fiscal year ended December 31, 2005, as previously filed with the SEC on March 29, 2006. |
| 10.3 | Employment Agreement, dated December 1, 2005, between the Registrant and Shmuel BenTov, incorporated by reference to Exhibit 10.1 to the Form 8-K dated December 12, 2005, as previously filed with the SEC on December 15, 2005. |
| 10.3.1 | Letter Agreement by and between the Registrant and Shmuel BenTov dated May 1, 2006, incorporated by reference to Exhibit 10.2 to the current report on Form 8-K, as previously filed with the SEC on May 1, 2006. |
| 10.4 | Form of S Corporation Termination, Tax Allocation and Indemnification Agreement, incorporated by reference to Exhibit 10.4 to the Registration Statement on Form SB-2, as previously filed with the SEC on August 6, 1997. |
| 10.5 | Letter of Undertaking from the Registrant and Shmuel BenTov, incorporated by reference to Exhibit 10.9 to the Registration Statement on Form SB-2, as previously filed with the SEC on July 23, 1997. |
| 10.6 | Shmuel BenTov Letter Commitment, dated March 29, 2001, incorporated by reference to Exhibit 10.10 to the Form 10-K for the fiscal year ended December 31, 2000, as previously filed with the SEC on April 2, 2001. |
| 10.7 | Form of Indemnification Agreement between the Registrant and certain of its Directors and its Chief Executive Officer, incorporated by reference to Exhibit 10.12 to the Form 10-Q for the period ended September 30, 2003 as filed with the SEC on November 11, 2003. |
| 10.8 | Employment Agreement, dated as of May 1 2006, between the Registrant and Salvatore M. Quadrino, incorporated by reference to Exhibit 10.1 to the current report on Form 8-K, as filed with the SEC on May 1, 2006. |
| 10.9 | Form of Release and Covenant Not to Sue entered into by the Registrant releasing certain parties, incorporated by reference to Exhibit 10.1 on Form 8-K, as filed with the SEC on June 2, 2006. |
| 10.10 | Form of Release and Covenant Not to Sue entered into by the certain parties releasing the Registrant, incorporated by reference to Exhibit 10.2 on Form 8-K, as filed with the SEC on June 2, 2006. |
| 10.11 | Employment Agreement, dated as of December 16, 1998, by and between the Registrant and Michael Prude, incorporated by reference to Exhibit 10.1 on Form 8-K, as filed with the SEC on June 9, 2006. |
| 10.12 | Professional Services Agreement by and between the Registrant and IonIdea, Inc. |
| 10.13 | Key-Person Life Insurance Premium Sharing Agreement effective as of July 1, 2006 by and among the Registrant, Helios & Matheson Parent and Mr. Shmuel BenTov, incorporate by reference to Exhibit 10.1 on Form 8-K, as filed with the SEC on June 30, 2006. |
| 10.14 | Letter from Helios & Matheson Information Technology Ltd. dated March 26, 2007. |
| 23.1 | Consent of Grant Thornton, LLP. |
| 23.2 | Consent of Mercadien, P.C., Certified Public Accountants. |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002. |

| Exhibit Number | Description of Exhibits |
| --- | --- |
| 31.2 | Certification of Principal Financial Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of the Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2.1 | Certification of the Principal Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

(b)  Exhibits – The response to this portion of Item 15 is submitted as a separate section of this report.

(c)  Financial Statement Schedules – The response to this portion of Item 15 is submitted as a separate section of this report at S-1.

**Exhibit 3.1**

**RESTATED**
**CERTIFICATE OF INCORPORATION**

**OF**

**THE A CONSULTING TEAM, INC.**

(Pursuant to Section 807 of the Business Corporation Law)

FIRST: The name of the corporation is The A Consulting Team, Inc. (the "Corporation"). The name under which the Corporation was originally formed was Software Ben-Tov, Inc.

SECOND: The certificate of incorporation of Software Ben-Tov, Inc. was filed by the Department of State of the State of New York on February 16, 1983.

THIRD: The certificate of incorporation, as amended, is hereby further amended and changed to effect certain of the amendments and changes authorized by the Business Corporation Law, to wit:

    (a) To increase the number of authorized shares of Common Stock, $0.01 par value, from 10,000,000 to 30,000,000.

    (b) To add a provision relating to shareholder action without a meeting.

FOURTH: To accomplish the foregoing amendments:

    (a) Article IV relating to the authorized shares of the Corporation is amended to read as set forth in the same numbered Article of the Certificate of Incorporation of the Corporation as hereinafter restated; and

    (b) A new Article VIII relating to shareholder action without a meeting is added as set forth in the same numbered Article of the Certificate of Incorporation of the Corporation as hereinafter restated.

    1. The text of the Certificate of Incorporation, as amended, is hereby restated as further amended and changed herein to read in its entirety as follows:

Exhibit 3.1

## CERTIFICATE OF INCORPORATION

### OF

### THE A CONSULTING TEAM, INC.
(Pursuant to Section 402 of the Business Corporation Law)

### ARTICLE I

The name of the Corporation is The A Consulting Team, Inc. (the "Corporation").

### ARTICLE II

The purpose for which the Corporation is formed is to engage in any lawful act or activity for which corporations may be organized under the Business Corporation Law of the State of New York; provided, however, that the Corporation is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency, or other body without such consent or approval first being obtained.

### ARTICLE III

The office of the Corporation is to be located in the County of New York in the State of New York.

### ARTICLE IV

The aggregate number of shares of capital stock which the Corporation shall have authority to issue is 32,000,000 shares, all of which are $0.01 par value, of which 30,000.000 shares shall be designated "Common Stock" and 2,000,000 shares of which shall be designated "Preferred Stock."

(a) Common Stock.

(1) Subject to the rights of any other class or series of stock, the holders of shares of Common Stock shall be entitled to receive, when and as declared by the Board of Directors, out of the assets of the Corporation legally available therefor, such dividends as may be declared from time to time by the Board of Directors.

(2) Subject to such rights of any other class or series of securities as may be granted from time to time, the holders of shares of Common Stock shall be entitled to receive all the assets of the Corporation available for distribution to shareholders in the event of the voluntary or involuntary liquidation, dissolution or winding up of the Corporation, ratably, in

2

Case 1:07-cv-03600-PAC      Document 8-4      Filed 05/18/2007      Page 10 of 51

Exhibit 3.1

proportion to the number of shares of Common Stock held by them. Neither the merger or consolidation of the Corporation into or with any other corporation nor the merger or consolidation of any other corporation into or with the Corporation nor the sale, lease, exchange or other disposition (for cash, shares of stock, securities or other consideration) of all or substantially all the assets of the Corporation shall be deemed to be a dissolution, liquidation or winding up, voluntary or involuntary, of the Corporation.

(3) Subject to such voting rights of any other class or series of securities as may be granted from time to time pursuant to this Certificate of Incorporation, any amendment thereto, or the provisions of the laws of the State of New York governing business corporations, voting rights shall be vested exclusively in the holders of Common Stock. Each holder of Common Stock shall have one vote in respect of each share of such stock held.

(b) <u>Preferred Stock</u>. The Board of Directors of the Corporation is authorized, subject to limitations prescribed by law and the provisions of this Certificate of Incorporation, to provide for the issuance of the Preferred Stock in series, and by filing a certificate pursuant to the view York Business Corporation Law, to establish the number of shares to be included in each such series, and to fix the designation, relative rights, preferences and limitations of the shares of each such series. The authority of the Board of Directors with respect to each series shall include, but not be limited to, determination of the following:

(1) The number of shares constituting that series and the distinctive designation of that series;

(2) Whether the holders of shares of that series shall be entitled to receive dividends and, if so, the rates of such dividends, the conditions under which and the times such dividends may be declared or paid, any preference of any such dividends to, and the relation to, the dividends payable on any other class or classes of stock or any other series of the same class and whether dividends shall be cumulative or non-cumulative and, if cumulative, from which date or dates;

(3) Whether the holders of shares of that series have voting rights in addition to the voting rights provided by law and, if so, the terms and conditions of exercise of such voting rights;

(4) Whether shares of that series shall be convertible into or exchangeable for shares of any other class, or any series of the same or any other class, and, if so, the terms and conditions thereof, including the date or dates when such shares shall be convertible into or exchangeable for shares of any other class, or any series of the same or any other class, the price or prices of or the rate or rates at which shares of such series shall be so convertible or exchangeable, and any adjustments which shall be made, and the circumstances in which any such adjustments shall be made, in such conversion or exchange prices or rates;

(5) Whether the shares of the series shall be redeemable, and, if so, the terms and conditions of such redemption, including the date or dates upon or after which they

3

Exhibit 3.1

shall be redeemable and the amount per share payable in case of redemption, which amount may vary under different conditions and at different redemption dates;

(6) Whether the shares of that series shall be subject to the operation of a retirement or sinking fund and, if so subject, the extent to and the manner in which it shall be applied to the purchase or redemption of the shares of that series, and the terms and provisions relative to the operation thereof;

(7) The rights of the shares of that series in the event of voluntary or involuntary liquidation, dissolution or winding up of the Corporation and any presence of any such rights to, and the relation to, the rights in respect thereto of any class or classes of stock or any other series of the same class; and

(8) Any other relative rights, preferences and limitations of that series; provided, however, that if the stated dividends and amounts payable on liquidation with respect to shares of any series of the Preferred Stock are not paid in full, the shares of all series of the Preferred Stocks shall share ratably in the payment of dividends including accumulations, if any, in accordance with the sums which would be payable on such shares if all dividends were declared and paid in full, and in any distribution of assets (other than by way of dividends) in accordance with the sums which would be payable on such distribution if all sums payable were discharged in full.

### ARTICLE V

The Secretary of State is designated as the agent of the Corporation upon whom process against the Corporation may be served. The post office address to which the Secretary of State shall mail a copy of any process against the Corporation served upon him or her is The A Consulting Team, Inc., 200 Park Avenue South, New York, New York 10003, Attn: Shmuel BenTov.

### ARTICLE VI

No holder of any of the shares of any class of the Corporation shall have any preemptive rights and, as such, no holder of any of the shares of any class of the Corporation shall be entitled as of right to subscribe for, purchase, or otherwise acquire any shares of any class of the Corporation which the Corporation proposes to issue or any rights or options which the Corporation proposes to grant for the purchase of shares of any class of the Corporation or for the purchase of any shares, bonds, securities, or obligations of the Corporation which are convertible into or exchangeable for, or which carry any rights, to subscribe for, purchase, or otherwise acquire shares of any class of the Corporation; and any and all of such shares, bonds, securities, or obligations of the Corporation, whether now or hereafter authorized or created, may be issued, or may be reissued or transferred if the same have been reacquired and have treasury status, and any and all of such rights and options may be granted by the Board of Directors to such persons, firms, corporations, and associations, and for such lawful consideration, and on

4

**Exhibit 3.1**

such terms, as the Board of Directors in its discretion may determine, without first offering the same, or any part thereof, to any said holder.

## ARTICLE VII

(a) The Corporation shall be permitted to indemnify, and advance expenses to, any person whom it has the power to indemnify to the fullest extent permitted by law, and, to the extent consistent therewith, shall indemnify or advance expenses to any such person to the fullest extent required by or pursuant to any by-law of the Corporation, agreement, resolution of directors, resolution of shareholders, directors' officers' liability insurance policies, or any other form of indemnification agreement.

(b) To the fullest extent now or hereafter permitted by law, directors of the Corporation shall not be liable to the Corporation or its shareholders for damages for any breach of duty in their capacity as directors.

## ARTICLE VIII

Whenever under the provisions of the Business Corporation Law shareholders are required or permitted to take any action by vote, such action may be taken without a meeting on written consent, signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, in accordance with the provisions of Section 615 of the Business Corporation Law.

FIFTH: The amendments to, and restatement of, the Certificate of Incorporation of the Corporation herein provided for were authorized by the unanimous written consent of the Board of Directors and by the vote of a least a majority of the outstanding shares of the Corporation entitled to vote hereon at a special meeting of the holders of such shares.

5

**Exhibit 3.1**

    **IN WITNESS WHEREOF**, the undersigned has executed, signed and verified this Restated Certificate of Incorporation this 14th day of June 2001, and affirm the statements herein as true under penalty of perjury.

THE A CONSULTING TEAM, INC.

By:  /s/ Shmuel BenTov                            
     Name:  Shmuel BenTov
     Title:    Chief Executive Officer and
               President

Case 1:07-cv-03600-PAC    Document 8-4    Filed 05/18/2007    Page 14 of 51

Exhibit 3.2.1

**CERTIFICATE OF AMENDMENT**
**OF THE**
**CERTIFICATE OF INCORPORATION**
**OF**
**THE A CONSULTING TEAM, INC.**

(Pursuant to Section 805 of the Business Corporation Law)

1. The name of the corporation is The A Consulting Team, Inc. (the "Corporation"). The name under which the Corporation was originally formed was Software Ben-Tov, Inc.

2. The certificate of incorporation of Software Ben-Tov, Inc. was filed by the Department of State of the State of New York on February 16, 1983, amended on April 26, 1983, restated on August 4, 1997 and further restated on June 18, 2002 (the "Restated Certificate of Incorporation").

3. The Certificate of Incorporation is hereby amended by the addition of the following provision stating the number, designation, relative rights, preferences and limitations of the shares of Series A Preferred Stock of the Corporation, as fixed by the Board of Directors of the Corporation:

ARTICLE FOURTH

(c) <u>Series A Preferred Stock.</u>

(1) <u>Number of Designated Shares of Series A Preferred Stock</u>. Of the total authorized number of 2,000,000 shares of Preferred Stock of the Corporation, there shall be designated a series of 530,304 shares which shall be issued in and constitute a single series to be known as "Series A Preferred Stock" (hereinafter called the "Series A Preferred Stock"). The par value per share of such Series A Preferred Stock shall be $0.01.

(2) <u>Dividends</u>. The holders of Series A Preferred Stock shall be entitled to (i) receive dividends, out of any assets legally available therefor, prior and in preference to any declaration or payment of any dividend (payable other than in Common Stock or other securities or rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common Stock) on the Common Stock, at the rate of $.0462 per annum per share of Series A Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares), and (ii) share in any dividends, if any, declared and paid upon or set aside for the Common Stock, <u>pro rata</u> in accordance with the number of shares of Common Stock into which such shares of Series A Preferred Stock are then convertible pursuant to Section 5. The dividends set forth in, (i) above shall be cumulative.

(3) <u>Rights on Liquidation, Dissolution or Winding-Up</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Series A Preferred Stock then outstanding shall be entitled to be paid out of the assets of the

1

Exhibit 3.2.1

Corporation available for distribution to its shareholders by reason of their ownership thereof; (A) before any payment shall be made to the holders of Common Stock or any other class or series of stock ranking on liquidation junior to the Series A Preferred Stock, and (B) after any payment shall be made to the holders of any class or series of preferred stock, whether now existing or hereafter created or designated, ranking by its terms senior in respect of liquidation, dissolution or winding up to the Series A Preferred Stock ("Senior Stock"), an amount equal to $0.66 per share (the "Series A Original Issuance Price") (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares), plus any dividends unpaid on such shares (the "Series A Preference Amount"). If upon any such liquidation, dissolution or winding up of the Corporation, and after payment of any amounts payable to Senior Stock, the remaining assets of the Corporation available for " distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock the full amount to which they each shall be entitled, the holders of shares of Series A Preferred Stock shall share ratably in any distribution of the remaining assets and funds of the Corporation in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

After distribution to the holders of Senior Stock and to holders of Series A Preferred Stock of the Series A Preference Amount, the remaining assets of the Corporation available for distribution, if any, to the shareholders of the Corporation shall be distributed exclusively to the holders of shares of Common Stock. A consolidation or merger of the Corporation into or with any other corporation or entity or the sale or transfer by the Corporation of all or substantially all of its assets (including any liquidation, dissolution or winding up associated therewith) shall not be deemed to be a liquidation within the meaning of this Section.

(4) Voting. In addition to any other rights provided by law or in the By-laws of the Corporation, each share of Series A Preferred Stock shall entitle the holder thereof to such number of votes per share as shall equal the number of shares of Common Stock (rounded down to the nearest whole number based on the aggregate number of shares of Series A Preferred Stock held by such shareholder) into which such share of Series A Preferred Stock is then convertible as provided in Section thereof, entitled to vote, in the same manner and with the same effect as such holders of Common Stock, voting together with the holders of Common Stock and any other class or series of preferred stock, whether now existing or hereafter created or designated (except and to the extent otherwise expressly provided in any such series or class of preferred stock), as one class.

(5) Option Conversion.

(a) The holder of any shares of Series A Preferred Stock shall have the right, at such holder's option, at any time or from time to time to convert any of such shares into such whole number of fully paid and nonassessable shares of Common Stock as is equal to the quotient obtained by dividing (A) the Series A Original Issuance Price multiplied by the number of shares of the Series A Preferred Stock being converted by (B) the Series A Preferred Conversion Price (as hereinafter defined), as last adjusted and then in effect, for the shares of the Series A Preferred Stock being converted, by surrender of the certificates representing the shares of Series A Preferred Stock so to be converted in the manner provided in Section 5(b) hereof. The

-2-

Exhibit 3.2.1

conversion price per share at which shares of Common Stock shall be issuable upon conversion of shares of Series A Preferred Stock (the "Series A Preferred Conversion Price") shall initially be the Series A Original Issuance Price; provided, however, that such Series A Preferred Conversion Price shall be subject to adjustment as set forth in Section 5(d) hereof.

(b) The holder of any shares of Series A Preferred Stock may exercise the conversion right pursuant to Section 5(a) hereof as to one or more shares thereof by delivering to the Corporation during regular business hours, at the office of the Corporation or any transfer agent of the Corporation for the Series A Preferred Stock as may be designated by the Corporation, the certificate or certificates for the shares to be converted, duly endorsed or assigned in blank or to the Corporation (if required by it), accompanied by written notice stating that the holder elects to convert such shares and stating the name or names (with address) in which the certificate or certificates for the shares of Common Stock are to be issued. Conversion shall be deemed to have been effected on the date when the aforesaid delivery is made (the "Conversion Date"). As promptly as practicable thereafter, the Corporation shall issue and deliver to or upon the written order of such holder, to the place designated by such holder, a certificate to which such holder is entitled and a check or cash in respect of any fractional interest in a share of Common Stock as provided in Section 5(c) hereof. The person in whose name the certificate or certificates for Common Stock are to be issued shall be deemed to have become a Common Stock holder of record on the applicable Conversion Date unless the transfer books of the Corporation are closed on that date, in which event such person shall be deemed to have become a Common Stock holder of record on the next succeeding date on which the transfer books are open, but the Series A Preferred Conversion Price shall be that in effect on the Conversion Date. Upon conversion of only a portion of the number of shares covered by a certificate representing shares of Series A Preferred Stock surrendered for conversion, the Corporation shall issue and deliver to or upon the written order of the holder of the certificate so surrendered for conversion, at the expense of the Corporation, a new certificate covering the number of shares of the series of Series A Preferred Stock representing the unconverted portion of the certificate so surrendered, which new certificate shall entitle the holder thereof to dividends on the shares of Series A Preferred Stock represented thereby to the same extent as if the portion of the certificate theretofore covering such unconverted shares had not been surrendered for conversion.

(c) No fractional shares of Common Stock or scrip shall be issued upon conversion of shares of Series A Preferred Stock. If more than one share of Series A Preferred Stock shall be surrendered for conversion at any one time by the same holder, the number of full shares of Common Stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of such Series A Preferred Stock so surrendered. Instead of any fractional shares of Common Stock which would otherwise be issuable upon conversion of any shares of Series A Preferred Stock, the Corporation shall pay a cash adjustment in respect of such fractional interest in an amount equal to the then fair market value, as determined in good faith by the Board of Directors of the Corporation, of a share of Common Stock multiplied by such fractional interest Fractional interests shall not be entitled to dividends, and the holders of fractional interests shall not be entitled to any rights as stockholders of the Corporation in respect of such fractional interest.

(d) For purposes of any adjustment of the Series A Preferred Conversion Price pursuant to this Section 5, the following provisions shall apply:

-3-

Exhibit 3.2.1

(i) If, at any time after the Original Issuance Date, the number of shares of Common Stock outstanding is increased by a stock dividend payable is shares of Common Stock or by a subdivision or split -up of shares of Common Stock, then, following the record date fixed for the determination of holders of Common Stock entitled to receive such stock dividend, subdivision or split-up, the Series A Preferred Conversion Price shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of each share of Series A Preferred Stock shall be increased in proportion to such increase in outstanding shares. "Original Issuance Date" shall mean the date of original issuance of the first share of Series A Preferred Stock.

(ii) If, at any time after the Original Issuance Date, the number of shares of Common Stock outstanding is decreased by a combination or reverse stock split of the outstanding shares of Common Stock, then, following the record date for such combination, the Series A Preferred Conversion Price for such series shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of each share of Series A Preferred Stock shall be decreased in proportion to such decrease in outstanding shares.

(iii) In case, at any tune after the Original Issuance Date, of any capital reorganization, or any reclassification of the stock of the Corporation (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or. subdivision, split-up or combination of shares), or the consolidation or merger of the Corporation with or into another person (other than a consolidation or merger in which the Corporation is the continuing corporation and which does not result in any change in the Common Stock) or of the sale or other disposition of all or substantially all the properties and assets of the Corporation as an entirety to any other person, each share of Series A Preferred Stock shall after such reorganization, reclassification, consolidation, merger, sale or other disposition be convertible into the kind and number of shares of stock or other securities or property of the Corporation or of the corporation resulting from such consolidation or surviving such merger or to which such properties and assets shall have been sold or otherwise disposed to which the holder of the number of shares of Common Stock deliverable (immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale or other disposition) upon conversion of such Series A Preferred Stock would have been entitled upon such reorganization, reclassification, consolidation, merger, sale or other disposition. The provisions of this Section 5 shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or other dispositions.

(iv) All calculations under Sections 5(d)(i), 5(d)(ii) and 5(d)(iii) shall be made to the nearest one tenth (1/10) of a cent of to the nearest one tenth (1/10) of a share, as the case may be, and in any case in which the provisions of this Section 5 shall require that an adjustment shall become effective immediately after a record date for an event, the Corporation may defer until the occurrence of such event (A) issuing to the holder of any share of Series A Preferred Stock converted after such record date and before the occurrence of such event the additional shares of capital stock issuable upon such conversion by reason of the adjustment required by such event over and above the shares of capital stock issuable upon such conversion before giving effect to such adjustment and (B) paying to such holder any amount in cash in lieu of a fractional share of capital stock pursuant to Section 5(c); provided, however, that the

-4-

Exhibit 3.2.1

Corporation shall deliver to such holder a due bill or other appropriate instrument evidencing such holder's right to receive such additional shares, and such cash, upon the occurrence of the event requiring such adjustment.

(e) Whenever the Series A Preferred Conversion Price shall be adjusted as provided in this Section 5, the Corporation shall forthwith file, at the office of the Corporation or of any transfer agent designated by the Corporation for the Series A Preferred Stock, a statement, signed by its chief financial officer, showing in detail the facts requiring such adjustment and the Series A Preferred Conversion Price then in effect. The Corporation shall also cause a copy of such statement to be sent by first-class certified mail, return receipt requested, postage prepaid, to each holder of shares of Series A Preferred Stock at his or its address appearing on the Corporation's records. Where appropriate, such copy may be given in advance and may be included as part of a notice required to be mailed under the provisions of Section 5.

(f) In the event the Corporation shall propose to take any action of the types described in Section 5(d), the Corporation shall give notice to each holder of shares of Series A Preferred Stock in the manner set forth in Section 5(e), which notice shall specify the record date, if any, with respect to any such action and the date on which such action is to take place. Such notice shall also set forth such facts with respect thereto as shall be reasonably necessary to indicate the effect of such action (to the extent such effect may be known at the date of such notice) on the Series A Preferred Conversion Price and the number, kind or class of shares or other securities or property which shall be deliverable or purchasable upon the occurrence of such action or deliverable upon conversion of shares of Series A Preferred Stock.

(g) The Corporation shall pay all documentary, stamp or other transactional taxes attributable to the issuance or delivery of shares of capital stock of the Corporation upon conversion of any shares of Series A Preferred Stock.

(h) The Corporation shall reserve, free from preemptive rights, out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of Series A Preferred Stock sufficient shares to provide for the conversion of all outstanding shares of Series A Preferred Stock.

(i) All shares of Common Stock which may be issued in connection with the conversion provisions set forth herein will, upon issuance by the Corporation, be validly issued, fully paid and nonassessable.

(6) Automatic Conversion. All shares of Series A Preferred Stock then outstanding shall, by virtue of, and simultaneously with, the affirmative vote of holders of a majority of the shares of Series A Preferred Stock then outstanding, and without any additional action on the part of the holders thereof, be deemed automatically converted into that number of fully paid and nonassessable shares of Common Stock into which such shares would have been convertible in the event of optional conversion at such time pursuant to Section 5 hereof. The provisions of Section 5 shall apply to any such automatic conversion.

(7) Redemption. The shares of Series A Preferred Stock are not redeemable.

-5-

Exhibit 3.2.1

IN WITNESS WHEREOF, this Certificate of Amendment to the Certificate of Incorporation of the Corporation has been signed by the Chief Financial Officer of the Corporation, this 8th day of August, 2002.

THE A CONSULTING TEAM, INC.

By: /s/ Richard D. Falcone
Name:  Richard D. Falcone
Title: Chief Financial Officer

-6-

Case 1:07-cv-03600-PAC          Document 8-4          Filed 05/18/2007          Page 20 of 51

Exhibit 3.2.2

# CERTIFICATE OF AMENDMENT
## OF THE
# CERTIFICATE OF INCORPORATION
## OF
# THE A CONSULTING TEAM, INC.

(Pursuant to Section 805 of the Business Corporation Law)

1. The name of the corporation is The A Consulting Team, Inc. (the "Corporation"). The name under which the Corporation was originally formed was Software Ben-Tov, Inc.

2. The certificate of incorporation of Software Ben-Tov, Inc. was filed by the Department of State of the State of New York on February 16, 1983, amended on April 26, 1983, restated on August 4, 1997, further restated on June 18, 2002, and amended on August 9, 2002 (collectively, the "Restated Certificate of Incorporation").

3. The Certificate of Incorporation is hereby amended by the addition of the following provision stating that out of this Corporation's authorized shares of Preferred Stock, there shall be designated a series of 41,311 shares which shall be issued in and constitute a single series to be known as "Series B Preferred Stock", such series shall have the relative rights, preferences and limitations, as authorized by the Board of Directors at a meeting on November 6, 2002 of the Corporation set forth below:

ARTICLE FOURTH

(d) Series B Preferred Stock.

(1) Number of Designated Shares of Series B Preferred Stock. Of the total authorized number of 2,000,000 shares of Preferred Stock of the Corporation, there shall be designated a series of 41,311 shares which shall be issued in and constitute a single series to be known as "Series B Preferred Stock" (hereinafter called the "Series B Preferred Stock"). The par value per share of such Series B Preferred Stock shall be $0.01.

(2) Dividends. The holders of Series B Preferred Stock shall be entitled to (i) receive dividends, out of any assets legally available therefor, (A) prior and in preference to any declaration or payment of any dividend (payable other than in Common Stock or other securities or rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common Stock) on the Common Stock, and (B) along with the holders of Series A Preferred Stock, pro rata in accordance with the number of shares into which the Series A Preferred Stock and Series B Preferred Stock are then convertible pursuant to Article IV, Sections (c)(5) and (d)(5), in each case, at the rate of $.0462 per annum per share of Series B Preferred Stock (subject to appropriate

Exhibit 3.2.2

adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares), and (ii) share, along with the Series A Preferred Stock, in any dividends, if any, declared and paid upon or set aside for the Common Stock, pro rata in accordance with the number of shares of Common Stock into which such shares of Series A Preferred Stock and Series B Preferred Stock are then convertible pursuant to Article IV, Sections (c)(5) and (d)(5). The dividends set forth in (i) above shall be cumulative.

(3) <u>Rights on Liquidation, Dissolution or Winding-Up</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Series B Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its shareholders by reason of their ownership thereof, (A) before any payment shall be made to the holders of Common Stock or any other class or series of stock ranking on liquidation junior to the Series B Preferred Stock, (B) after any payment shall be made to the holders of any class or series of preferred stock, whether now existing or hereafter created or designated, ranking by its terms senior in respect of liquidation, dissolution or winding up to the Series B Preferred Stock ("Senior Stock"), and (C) along with the Series A Preferred Stock, pro rata in accordance with the number of shares of Common Stock into which such shares of Series A Preferred Stock and Series B Preferred Stock are then convertible pursuant to Article IV, Sections (c)(5) and (d)(5), an amount equal to $0.66 per share (the "Series B Original Issuance Price") (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares), plus any dividends unpaid on such shares (the "Series B Preference Amount"). If upon any such liquidation, dissolution or winding up of the Corporation, and after payment of any amounts payable to Senior Stock, the remaining assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock and Series B Preferred Stock the full amount to which they each shall be entitled, the holders of shares of Series A Preferred Stock and Series B Preferred Stock shall share ratably in any distribution of the remaining assets and funds of the Corporation in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

After distribution to the holders of Senior Stock and to holders of Series A Preferred Stock of the Series A Preference Amount and the Series B Preferred Stock of the Series B Preference Amount, the remaining assets of the Corporation available for distribution, if any, to the shareholders of the Corporation shall be distributed exclusively to the holders of shares of Common Stock. A consolidation or merger of the Corporation into or with any other corporation or entity or the sale or transfer by the Corporation of all or substantially all of its assets (including any liquidation, dissolution or winding up associated therewith) shall not be deemed to be a liquidation within the meaning of this Section.

Case 1:07-cv-03600-PAC     Document 8-4     Filed 05/18/2007     Page 22 of 51

Exhibit 3.2.2

(4) <u>Voting</u>. In addition to any other rights provided by law or in the By-laws of the Corporation, each share of Series B Preferred Stock shall entitle the holder thereof to such number of votes per share as shall equal the number of shares of Common Stock (rounded down to the nearest whole number based on the aggregate number of shares of Series B Preferred Stock held by such shareholder) into which such share of Series B Preferred Stock is then convertible as provided in Section 5 hereof, entitled to vote, in the same manner and with the same effect as such holders of Common Stock, voting together with the holders of Common Stock and any other class or series of preferred stock, whether now existing or hereafter created or designated (except and to the extent otherwise expressly provided in any such series or class of preferred stock), as one class.

(5) <u>Optional Conversion</u>.

(a) The holder of any shares of Series B Preferred Stock shall have the right, at such holder's option, at any time or from time to time to convert any of such shares into such whole number of fully paid and nonassessable shares of Common Stock as is equal to the quotient obtained by dividing (A) the Series B Original Issuance Price multiplied by the number of shares of the Series B Preferred Stock being converted by (B) the Series B Preferred Conversion Price (as hereinafter defined), as last adjusted and then in effect, for the shares of the Series B Preferred Stock being converted, by surrender of the certificates representing the shares of Series B Preferred Stock so to be converted in the manner provided in Section 5(b) hereof. The conversion price per share at which shares of Common Stock shall be issuable upon conversion of shares of Series B Preferred Stock (the "Series B Preferred Conversion Price") shall initially be the Series B Original Issuance Price; provided, however, that such Series B Preferred Conversion Price shall be subject to adjustment as set forth in Section 5(d) hereof.

(b) The holder of any shares of Series B Preferred Stock may exercise the conversion right pursuant to Section 5(a) hereof as to one or more shares thereof by delivering to the Corporation during regular business hours, at the office of the Corporation or any transfer agent of the Corporation for the Series B Preferred Stock as may be designated by the Corporation, the certificate or certificates for the shares to be converted, duly endorsed or assigned in blank or to the Corporation (if required by it), accompanied by written notice stating that the holder elects to convert such shares and stating the name or names (with address) in which the certificate or certificates for the shares of Common Stock are to be issued. Conversion shall be deemed to have been effected on the date when the aforesaid delivery is made (the "Conversion Date"). As promptly as practicable thereafter, the Corporation shall issue and deliver to or upon the written order of such holder, to the place designated by such holder, a certificate to which such holder is entitled and a check or cash in respect of any fractional interest in a share of Common Stock as provided in Section 5(c) hereof. The person in whose name the certificate or certificates for Common Stock are to be issued shall be deemed to have become a Common Stock holder of record on the applicable Conversion Date unless the transfer books of the Corporation are closed on that date, in which event such person shall be deemed to have become a Common Stock holder of record on the next

Exhibit 3.2.2

succeeding date on which the transfer books are open, but the Series B Preferred Conversion Price shall be that in effect on the Conversion Date. Upon conversion of only a portion of the number of shares covered by a certificate representing shares of Series B Preferred Stock surrendered for conversion, the Corporation shall issue and deliver to or upon the written order of the holder of the certificate so surrendered for conversion, at the expense of the Corporation, a new certificate covering the number of shares of the series of Series B Preferred Stock representing the unconverted portion of the certificate so surrendered, which new certificate shall entitle the holder thereof to dividends on the shares of Series B Preferred Stock represented thereby to the same extent as if the portion of the certificate theretofore covering such unconverted shares had not been surrendered for conversion.

(c) No fractional shares of Common Stock or scrip shall be issued upon conversion of shares of Series B Preferred Stock. If more than one share of Series B Preferred Stock shall be surrendered for conversion at any one time by the same holder, the number of full shares of Common Stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of such Series B Preferred Stock so surrendered. Instead of any fractional shares of Common Stock which would otherwise be issuable upon conversion of any shares of Series B Preferred Stock, the Corporation shall pay a cash adjustment in respect of such fractional interest in an amount equal to the then fair market value, as determined in good faith by the Board of Directors of the Corporation, of a share of Common Stock multiplied by such fractional interest. Fractional interests shall not be entitled to dividends, and the holders of fractional interests shall not be entitled to any rights as stockholders of the Corporation in respect of such fractional interest.

(d) For purposes of any adjustment of the Series B Preferred Conversion Price pursuant to this Section 5, the following provisions shall apply:

(i) If, at any time after the Original Series B Issuance Date (as defined below), the number of shares of Common Stock outstanding is increased by a stock dividend payable in shares of Common Stock or by a subdivision or split-up of shares of Common Stock, then, following the record date fixed for the determination of holders of Common Stock entitled to receive such stock dividend, subdivision or split-up, the Series B Preferred Conversion Price shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of each share of Series B Preferred Stock shall be increased in proportion to such increase in outstanding shares. "Original Series B Issuance Date" shall mean the date of original issuance of the first share of Series B Preferred Stock.

(ii) If, at any time after the Original Series B Issuance Date, the number of shares of Common Stock outstanding is decreased by a combination or reverse stock split of the outstanding shares of

Exhibit 3.2.2

Common Stock, then, following the record date for such combination, the Series B Preferred Conversion Price for such series shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of each share of Series B Preferred Stock shall be decreased in proportion to such decrease in outstanding shares.

(iii) In case, at any time after the Original Series B Issuance Date, of any capital reorganization, or any reclassification of the stock of the Corporation (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or the consolidation or merger of the Corporation with or into another person (other than a consolidation or merger in which the Corporation is the continuing corporation and which does not result in any change in the Common Stock) or of the sale or other disposition of all or substantially all the properties and assets of the Corporation as an entirety to any other person, each share of Series B Preferred Stock shall after such reorganization, reclassification, consolidation, merger, sale or other disposition be convertible into the kind and number of shares of stock or other securities or property of the Corporation or of the corporation resulting from such consolidation or surviving such merger or to which such properties and assets shall have been sold or otherwise disposed to which the holder of the number of shares of Common Stock deliverable (immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale or other disposition) upon conversion of such Series B Preferred Stock would have been entitled upon such reorganization, reclassification, consolidation, merger, sale or other disposition. The provisions of this Section 5 shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or other dispositions.

(iv) All calculations under Sections 5(d)(i), 5(d)(ii) and 5(d)(iii) shall be made to the nearest one tenth (1/10) of a cent or to the nearest one tenth (1/10) of a share, as the case may be, and in any case in which the provisions of this Section 5 shall require that an adjustment shall become effective immediately after a record date for an event, the Corporation may defer until the occurrence of such event (A) issuing to the holder of any share of Series B Preferred Stock converted after such record date and before the occurrence of such event the additional shares of capital stock issuable upon such conversion by reason of the adjustment required by such event over and above the shares of capital stock issuable upon such conversion before giving effect to such adjustment and (B) paying to such holder any amount in cash in lieu of a fractional share of capital stock pursuant to Section 5(c); provided, however, that the Corporation shall deliver to such holder a due bill or

Exhibit 3.2.2

other appropriate instrument evidencing such holder's right to receive such additional shares, and such cash, upon the occurrence of the event requiring such adjustment.

(e) Whenever the Series B Preferred Conversion Price shall be adjusted as provided in this Section 5, the Corporation shall forthwith file, at the office of the Corporation or of any transfer agent designated by the Corporation for the Series B Preferred Stock, a statement, signed by its chief financial officer, showing in detail the facts requiring such adjustment and the Series B Preferred Conversion Price then in effect. The Corporation shall also cause a copy of such statement to be sent by first-class certified mail, return receipt requested, postage prepaid, to each holder of shares of Series B Preferred Stock at his or its address appearing on the Corporation's records. Where appropriate, such copy may be given in advance and may be included as part of a notice required to be mailed under the provisions of Section 5.

(f) In the event the Corporation shall propose to take any action of the types described in Section 5(d), the Corporation shall give notice to each holder of shares of Series B Preferred Stock in the manner set forth in Section 5(e), which notice shall specify the record date, if any, with respect to any such action and the date on which such action is to take place. Such notice shall also set forth such facts with respect thereto as shall be reasonably necessary to indicate the effect of such action (to the extent such effect may be known at the date of such notice) on the Series B Preferred Conversion Price and the number, kind or class of shares or other securities or property which shall be deliverable or purchasable upon the occurrence of such action or deliverable upon conversion of shares of Series B Preferred Stock.

(g) The Corporation shall pay all documentary, stamp or other transactional taxes attributable to the issuance or delivery of shares of capital stock of the Corporation upon conversion of any shares of Series B Preferred Stock.

(h) The Corporation shall reserve, free from preemptive rights, out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of Series B Preferred Stock sufficient shares to provide for the conversion of all outstanding shares of Series B Preferred Stock.

(i) All shares of Common Stock which may be issued in connection with the conversion provisions set forth herein will, upon issuance by the Corporation, be validly issued, fully paid and nonassessable.

(6) <u>Automatic Conversion</u>.

(a) All shares of Series B Preferred Stock then outstanding shall, by virtue of, and simultaneously with, the affirmative vote of holders of a majority of the shares of Series B Preferred Stock then outstanding, and without any additional action on the part of the holders thereof, be deemed automatically converted into that number of fully paid and nonassessable shares of Common Stock into which such shares would have been

Exhibit 3.2.2

convertible in the event of optional conversion at such time pursuant to Section 5 hereof. The provisions of Section 5 shall apply to any such automatic conversion.

(b) All shares of Series B Preferred Stock then outstanding shall, by virtue of, and simultaneously with, the automatic conversion, pursuant to Article IV, Section (c)(6), of the shares of Series A Preferred Stock then outstanding, and without any additional action on the part of the holders thereof, be deemed automatically converted into that number of fully paid and nonassessable shares of Common Stock into which such shares would have been convertible in the event of optional conversion at such time pursuant to Section 5 hereof. The provisions of Section 5 shall apply to any such automatic conversion.

(7) <u>Redemption</u>. The shares of Series B Preferred Stock are not redeemable.

**IN WITNESS WHEREOF**, this Certificate of Amendment to the Certificate of Incorporation of the Corporation has been signed by the Chief Financial Officer of the Corporation, this 11th day of November, 2002.

THE A CONSULTING TEAM, INC.

By:    /s/ Richard D. Falcone
Name: Richard D. Falcone
Title: Chief Financial Officer

Exhibit 3.2.3

# CERTIFICATE OF AMENDMENT
## OF THE
## CERTIFICATE OF INCORPORATION
### OF
## THE A CONSULTING TEAM, INC.

(Pursuant to Section 805 of the Business Corporation Law)

The A Consulting Team, Inc., a New York corporation (the "Corporation"), hereby certifies as follows:

FIRST: The current name of the Corporation is "The A Consulting Team, Inc." The name under which the Corporation was originally formed was "Software Ben-Tov, Inc."

SECOND: The certificate of incorporation of Software Ben-Tov, Inc. was filed by the Department of State of the State of New York on February 16, 1983, amended on April 26, 1983, restated on August 4, 1997, further restated on June 18, 2001, further amended on August 9, 2002, and further amended on November 11, 2002.

THIRD: The certificate of incorporation, as amended and restated, is further amended by effecting a change of authorized shares (hereinafter referred to as the "Reverse Stock Split"), pursuant to which each four (4) shares of the issued and outstanding shares of Common Stock of the Corporation shall be changed into one (1) validly issued, fully paid and outstanding share of Common Stock of the Corporation and each one (1) share of the unissued shares of Common Stock of the Corporation shall be changed into one and twenty-nine one hundredths (1.29) shares of unissued Common Stock of the Corporation. As a result of the Reverse Stock Split:

(a) the 8,431,871 issued shares of Common Stock of the Corporation, par value $0.01, shall be changed into 2,107,967 issued shares of Common Stock of the Corporation, par value $0.01;

(b) the 21,568,129 unissued shares of Common Stock of the Corporation, par value $0.01, shall be changed into 27,892,033 unissued shares of Common Stock of the Corporation, par value $0.01;

(c) no scrip or fractional shares will be issued by reason of the Reverse Stock Split; in lieu thereof, cash shall be distributed to each shareholder of the Corporation who would otherwise have been entitled to receipt of a fractional share and that the amount of cash to be distributed shall be based upon the average closing sale price of a share of Common Stock on The Nasdaq SmallCap Market for the ten (10) trading days immediately prior to the effective date of this Certificate of Amendment, or if no such sale takes place on such days, the average of the closing bid and asked prices for such days, in each case as officially reported by Nasdaq; and

(d) the stated capital of the Common Stock of the Corporation shall be changed from $84,318.71 to $21,079.67.

1

Exhibit 3.2.3

FOURTH: This Amendment was duly adopted in accordance with Section 708 of the Business Corporation Law of the State of New York by the Board of Directors of the Corporation at a meeting of the Board of Directors of the Corporation and by the requisite number of shares held by shareholders of the Corporation at a meeting of the shareholders of the Corporation.

2

Exhibit 3.2.3

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Amendment of the Restated Certificate of Incorporation to be signed as of the 5th day of January, 2004, by its Chief Financial Officer, who hereby affirms and acknowledges, under penalty of perjury, that this Certificate is the act and deed of the Corporation and that the facts stated herein are true.

THE A CONSULTING TEAM, INC.

By: /s/ Richard D. Falcone _____
     Name:  Richard D. Falcone
     Title:   Chief Financial Officer

3

Exhibit 3.2.4

### CERTIFICATE OF AMENDMENT
### OF THE
### CERTIFICATE OF INCORPORATION
### OF
### THE A CONSULTING TEAM, INC.

(Pursuant to Section 805 of the Business Corporation Law)

1. The name of the corporation is The A Consulting Team, Inc. (the "Corporation"). The name under which the Corporation was originally formed was Software Ben-Tov, Inc.

2. The certificate of incorporation of the Corporation was filed by the Department of State of the State of New York on February 16, 1983.

3. The Certificate of Incorporation is hereby further amended by effecting a change of the Corporation's name from "The A Consulting Team, Inc." to "Helios & Matheson North America Inc."

4. The Certificate of Incorporation shall otherwise continue in full force and effect except that (i) the first sentence of Article I is hereby amended to read in its entirety as "The name of the Corporation is Helios & Matheson North America Inc." and (ii) all references to the "Corporation" shall refer to Helios & Matheson North America Inc.

5. This Certificate of Amendment was duly adopted in accordance with Section 803 of the Business Corporation Law of the State of New York by (i) the Board of Directors of the Corporation and (ii) the requisite number of stockholders of the Corporation at a meeting of the stockholders of the Corporation.

IN WITNESS WHEREOF, this Certificate of Amendment to the Certificate of Incorporation of the Corporation has been signed by the Chief Financial Officer of the Corporation, this 30th day of January, 2007.

THE A CONSULTING TEAM, INC.

By: /s/ Salvatore Quadrino
     Salvatore Quadrino
     Chief Financial Officer

1

**EXHIBIT 4.1**





| | |
|---|---|
| **AMERICAN BANK NOTE COMPANY** | PRODUCTION COORDINATOR: MIKE PETERS 931-490-1714 |
| **711 ARMSTRONG LANE**<br>**COLUMBIA, TENNESSEE 38401**<br>**(931) 388-3003**<br>SALES: R. JOHNS 516-731-2885<br>/ ETHER 7 / LIVE JOBS / H / HELIOS 26575 FC | PROOF OF MARCH 23, 2007<br>**HELIOS & MATHESON NORTH AMERICA INC.**<br>**TSB 26575 FC**<br>Operator :     Ron<br>New |

**PLEASE INITIAL THE APPROPRIATE SELECTION FOR THIS PROOF:_____ OK AS IS _____OK WITH CHANGES_____ MAKE CHANGES AND SEND ANOTHER PROOF**

Colors Selected for Printing: **LOGO IS OF LOW RESOLUTION AND NOT SUITABLE FOR PRINTING.** Intaglio prints in SC-7 Dark Blue.

**COLOR:** This proof was printed from a digital file or artwork on a graphics quality, color laser printer. It is a good representation of the color as it will appear on the final product. However, II is not an exact color rendition, and the final printed product may appear slightly different from the proof due to the difference between the dyes and printing Ink.

Exhibit 10.1.3

AMENDMENT NO. 2
TO
HELIOS & MATHESON NORTH AMERICA INC.
AMENDED AND RESTATED 1997 STOCK OPTION AND AWARD PLAN

THIS AMENDMENT NO. 2 is made by Helios and Matheson North America Inc., a New York corporation (the "Company").

WITNESSETH

WHEREAS, the Company adopted The A Consulting Team, Inc. Amended and Restated 1997 Stock Option and Award Plan (the "Plan");

WHEREAS, the Company, subsequent to the adoption of the Plan, has changed its name to Helios & Matheson North America Inc.;

WHEREAS, the Plan grants to each new non-employee director who first becomes a non-employee director after the effective date of the Plan, an option to purchase 250 shares of the Company's common stock (the "Shares") under Section 9.1.1;

WHEREAS, the Plan grants each non-employee director who was re-elected as a non-employee director of the Company, an option to purchase 250 Shares upon re-election under Section 9.1.2;

WHEREAS, the Company desires to change the name of the Plan to reflect the name change of the Company and wants to remove such options granted to non-employee directors and make any conforming changes that it deems are necessary as result of such removals;

NOW, THEREFORE, pursuant to the rights reserved under Section 11.1 of the Plan, the Company hereby amends the Plan as follows:

1. The name of the Plan shall be amended to read as follows: "Helios & Matheson North America Inc. Amended and Restated 1997 Stock Option and Award Plan."

2. Section 9.1.1 shall be removed from the Plan in its entirety.

3. Section 9.1.2 shall be removed from the Plan in its entirety.

4. Section 9.1.3 shall be amended to read as follows:

**Exhibit 10.1.3**

"Discretionary Options. The Board, in its sole discretion, may grant Nonqualified Stock Options to purchase up to 5,000 Shares per calendar year to each Non-employee Director."

5.    Sections 9.1.3 and 9.1.4 shall be re-designated Sections 9.1.1 and 9.1.2 respectively.

6.    Except as set forth herein, the Plan shall remain unmodified.

IN WITNESS WHEREOF, the Company has caused this Amendment No. 2 to be executed by a duly authorized officer as of the 28th day of March 2007.

Helios & Matheson North America Inc.

/s/ Salvatore M. Quadrino
Name:  Salvatore M. Quadrino
Title:    Chief Financial Officer

EXHIBIT 10.12

## PROFESSIONAL SERVICES AGREEMENT

The A Consulting Team, Inc. (TACT) having its offices at 77 Brant Avenue, Suite 320, Clark, NJ *07066* ("Customer"), and IonIdea, Inc., a Virginia corporation having its principal place of business at 3913 Old Lee Highway, Suite 33B, Fairfax, VA 22030 ("Supplier"), hereinafter separately referred to as the "Party" or jointly referred to as the "Parties", enter into this Professional Services Agreement ("Agreement") this 27th of June, 2006 ("Effective Date").

### l. DEFINITIONS

For the purpose of this Agreement, capitalized terms shall have the following meanings or the meaning in the attached Statement (s) of Work.

**(a) "Acceptance"** means the point in time when the Deliverables conform to the Specifications; Acceptance shall be evidenced by the issuance by Customer of an acceptance certificate;

**(b) "Affiliates"** means Customer and any entity it controls; where "control" means direct or indirect ownership of fifty percent (50%) or more of the stock entitled to vote at general meetings, or the right to appoint a majority of the board of directors, or a body performing a similar function;

**(c) "Deliverables"** means the machines, software, design specifications, computer programs, and original works of authorship developed by Supplier under this Agreement;

**(d) "Order"** means Customer's order for Services in a written or electronic format.

**(e) "Service(s)"** means any and all services defined in Statement(s) of Work to be provided by Supplier under this Agreement;

**(f) "Specifications"** means the technical and normative description of the Deliverables.

**(g) "Product"** means the Customer's Product.

**(h) "Test Plan"** means the document describing the schedule, framework and procedures associated to acceptance tests.

### 2. SCOPE OF THE AGREEMENT

Customer and Affiliates may each obtain Services according to the terms of this Agreement by executing Statement(s) of Work which may be confirmed by Order(s). All Statement(s) of Work and Order(s) are incorporated into this Agreement and made a part hereof as Exhibits A.1, A.2 and so on as between Supplier and the Customer or Affiliate (as the case may be) having signed the Statement of Work. Supplier acknowledges and agrees that by signing a Statement of Work, the Affiliate accepts to be bound by the terms and conditions of this Agreement and that the Affiliate has sole and unique responsibility with respect to its Statement(s) of Work and/or Order(s). For purposes of applying this Agreement as between the Affiliate who signs the Statement of Work and Supplier, all references to Customer shall be understood to mean the Affiliate who signed the Statement of Work.

Supplier represents and warrants that it has the rights necessary to enter into this Agreement. Supplier agrees to provide the Services in accordance with this Agreement no later than the milestones dates identified in Statement(s) of Work.

### 3. SELECTION OF EMPLOYEES

Supplier shall designate the Supplier employee(s) who shall perform the Services as well as a Project Manager who shall be responsible for overseeing Supplier's overall performance under a Statement of Work. Supplier shall use its best efforts to comply with requests from Customer for specific Supplier employees. Supplier's employees will be able to work in English. Supplier shall replace employee(s) performing Services upon request by Customer for good and lawful reasons. If, for reasons beyond Supplier's control, Supplier's employee(s) assigned to the execution of the Services are not available, Supplier shall (i) assign an employee with the same qualifications, and (ii) be responsible for the time and all associated charges required for the transfer of qualifications necessary for the execution of the Services, such time to be mutually agreed by the Parties. During its presence at Customer's or Affiliates' premises, Supplier personnel will respect the rules in force at these premises, as communicated to them by Customer, and in particular, the hygiene, security and safety rules. Supplier's personnel shall at all times remain under the sole authority and responsibility of Supplier.

Additionally, all persons contracted to perform professional services on behalf of Customer (whether as a Contractor or Temporary personnel shall be held to the same standard as Customer's regular employees with regards to adherence to Customer Human Resources policies and procedures. Should any such person violate the stated company policies, which

shall include, but not be limited to policies pertaining to Harassment and Discrimination, Employee Conduct and Work Rules, Dress Code, Use of Company Equipment and Internet Usage, Customer reserves the right to immediately remove the individual violator from its premise and/or immediately terminate the contract relationship with the violator.

**Professional Services Agreement • V2.1**

**Confidential**                                     **Page 1**                                     31/01/2007

EXHIBIT 10.12

## PROFESSIONAL SERVICES AGREEMENT

### 4. RIGHTS TO DELIVERABLES

Customer and Supplier acknowledge that when the performance of this Agreement results in the creation or development of Deliverables, all right title and interest therein will vest *ab initio* in Customer and/or Affiliates, except as provided in Section 5 below. Supplier shall treat Deliverables as Confidential Information for purposes of Section 12.2 below.

### 5. PROPRIETARY MATERIALS

The Parties acknowledge that a Statement of Work may necessitate the provision by Supplier and/or Customer of certain software, specifications, documentation or other materials which are proprietary to Customer or a third party "Customer Proprietary Materials" or Supplier or a third party "Supplier Proprietary Materials". Except as expressly authorized by a Statement of Work, neither Party shall and shall not permit any third party to copy, translate, reverse engineer, decompile, recompile, update or modify all or any part of the other Party's Proprietary Materials. Each Party shall respect the other Party's Proprietary Materials and shall convey to the other Party such license or other usage rights thereto as are set forth in the Statement of Work. Supplier Proprietary Materials shall be considered as Deliverables for the purposes of applying Article 10.1 hereof.

### 6. TESTING AND ACCEPTANCE

Except as otherwise stipulated in the Statement of Work, as soon as practicable after delivery of the Deliverables by Supplier, Customer shall perform acceptance testing of the Deliverables pursuant to a mutually agreed upon Test Plan, to confirm conformity of the Deliverables with the Specifications therefore constituting a part of or delivered pursuant to a Statement of Work. Supplier shall provide all necessary assistance to Customer during such acceptance testing. Customer shall notify Supplier as soon as practicable in writing of any such non-conformities of the Deliverables to the Specifications. Supplier shall thereupon correct any such non-conformities and resubmit the Deliverables. In the event that the said round of acceptance testing is unsuccessful, Customer shall have the right, at its sole discretion to either terminate the Statement of Work and recover any fees paid by Customer or resubmit the Deliverables for a further round of acceptance tests pursuant to the foregoing procedure.

### 7. PRICE AND PAYMENT PROVISIONS

7.1 In consideration of the Services performed by Supplier hereunder, Supplier shall invoice Customer at such times, and Customer shall pay Supplier, such fees as are set forth in the Statement(s) of Work.

7.2 All invoices shall be payable within forty five (45) days of the date of invoice. Any sum not paid by Customer within due date will bear interest from date of invoice until paid at a rate of 1.00% per month (12% per annum).

7.3 The fees prescribed by Section 7.1 do not include taxes or other duties which are for the account of Customer, excluding taxes based on Supplier's income.

7.4 Upon submission of an invoice, Customer shall reimburse Supplier for reasonable travel and incidental expenses actually without mark-up incurred in connection with Services provided hereunder, provided, however, that (a) all such costs shall be subject to the prior written consent of Customer (b) all travel shall be in economy class, (c) subsistence expenses shall not exceed Customer's then current per-diem amounts, (d) if Customer so requests, Supplier shall use the same hotel facilities as those used by Customer, (e) if Customer so requests, Supplier shall use the travel facilities made available to them by Customer and (f) all such expenses shall be supported by appropriate justifications.

### 8. TERM

**8.1 Term of the Agreement.** This Agreement is legally binding as of the Effective Date and shall continue in full force and effect until completion of all work prescribed by Statement(s) of Work.

**8.2 Term of Services.** The term of Services shall be as provided in the appropriate Statement(s) of Work or until the completion of the Services, whichever is later.

**8.3 Termination for Convenience.** Except as provided in a Statement of Work, Customer shall have the right to elect to terminate a Statement of Work, at any time, by providing Supplier with thirty (30) days prior written notice of said election.

**8.4 Termination by Either Party for Material Breach and Bankruptcy.** Either party may terminate this Agreement (or

any part thereof) or any Statement of Work upon written notice (a) if the other party materially breaches this Agreement and fails to cure such breach within thirty (30) days following receipt of written notice specifying the breach in detail or (b) if either Party files a petition for relief under any bankruptcy legislation, if any involuntary petition thereunder should be filed against either Party and the same not be dismissed within thirty (30) days, if either Party is adjudicated a bankrupt or if either Party makes an assignment for the benefit of creditors.

**8.5 Effect Of Termination.** The termination of this Agreement shall not relieve either party

**Professional Services Agreement**                                      **Page 2**

**Confidential**

EXHIBIT 10.12

## PROFESSIONAL SERVICES AGREEMENT

from its obligations owed to the other party as at the effective date of termination, which obligations shall survive the termination of this Agreement. Termination of this Agreement shall not limit either party from pursuing other remedies available to it. The provisions of Articles 3, 4, 5, 8, 9, 10, 11 and 12 shall survive the termination of this Agreement. Termination of this Agreement will not in itself terminate the Statement(s) of Work still in force at the time of said termination and such Statement(s) of Work shall remain subject to the terms of this Agreement.

## 9. WARRANTIES

**A. Services Warranty.** Supplier warrants that the Services that it will provide hereunder will be performed in accordance with established industry 11.1 standards with appropriately qualified personnel.

**B. Deliverables.** Supplier warrants that the Deliverables will conform to the Specifications.

**C. DISCLAIMER.** EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE WARRANTIES CONTAINED IN THIS ARTICLE 9 ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY.

## 10. INDEMNIFICATION

**10.1 Intellectual Property Rights Warranty/Indemnification.** Supplier represents and warrants that the Deliverables do not infringe the intellectual property rights of any third party. Supplier shall indemnify and hold harmless Customer and Affiliates, and their directors, officers, employees, agents and end-users against any and all losses, liabilities, judgments, awards and costs and expenses arising out of or related to any claim that use or possession of the Deliverables, infringes the patent, copyright, trade secret, or other proprietary right of any third party. Supplier shall defend and settle at its sole expense all suits or proceedings arising out of the foregoing, provided that Customer gives Supplier prompt notice of any such claim. If the Deliverables are held to be or are believed by Supplier to infringe a third party intellectual property right, then Supplier shall at its sole discretion: (a) obtain for Customer the right to continue to use the Deliverables, or (b) replace or modify the Deliverables so as to make them non-infringing or if neither of the above are feasible, terminate this Agreement with respect to the infringing Deliverables and reimburse Customer for the fees paid for those Deliverables. Supplier shall have no liability for any claim of infringement based on (a) the use of a superseded or altered release of the Deliverables by Customer if the infringement could have been avoided by the use of the current unaltered release of the Deliverables, which Supplier provided to Customer (b) the use of the Deliverables by Customer other than in accordance with the Specifications.

**10.2 General Indemnity.** Each party shall defend and indemnify the other party and their respective directors, employees, officers, agents and Affiliates against all damages for bodily injury, death, or damage to real or personal property caused by the other party in the course of performing under this Agreement.

## 11. LIMITATION OF LIABILITY.

Neither Party shall be liable for any incidental, special, exemplary, consequential or indirect damages, including without limitation lost data, profits, revenues, even if advised of the possibility of such damages. Suppliers maximum liability to Customer and Customer's and Affiliates' maximum collective liability to Supplier shall not exceed the greater of the aggregate amount actually paid under this Agreement or the fees to be paid under the applicable Statement of Work. The above exclusions or limitations of liability will apply only to the extent permitted by applicable law and do not apply to the parties liability under Articles 10.1, 10.2 and 12.2.

## 12. GENERAL

**12.1 Notices.** All notices under this Agreement shall be sufficient if sent by certified mail, return receipt requested, to the parties at the respective addresses set forth above or to such other address as a Party has designated by notice to the other Party.

**12.2 Non-Disclosure.** For purposes of this Agreement, "Confidential Information" means: a) the present Agreement and b) any and all data, software, know-how, trade secret, designs, plans, drawings, specifications, documentation, reports, manuals, Products, Deliverables, services, customers, and prospects and other information of every kind and description heretofore disclosed, or which may be hereafter disclosed by a Party to the other Party, except anything designated as not confidential. The receiving Party of Confidential Information shall (i) not disclose the Confidential Information to any third party

(including use of Customer's name and/or Confidential Information via press release, advertising or marketing literature), without the prior written consent of the other Party; (ii) treat the Confidential Information with the same level of care that it affords its own Confidential Information, but in no event less than a reasonable level of care; (iii) use the Confidential Information only in connection with the

**Professional Services Agreement**                                                                                    **Page 3**

**Confidential**

EXHIBIT 10.12

## PROFESSIONAL SERVICES AGREEMENT

performance of this Agreement and confine its distribution within its organization (which in the case of Customer shall include Affiliates or its/their contractors or agent), to those individuals having a need to know the Confidential Information in connection with the performance of this Agreement. No restrictions apply to any information that (a) is independently developed by the receiving Party; or (b) at the time of disclosure, was known to the receiving Party free of restriction; or (c) is lawfully received from another source free of restriction and without breach of the Agreement; or (d) is or becomes a matter of public knowledge without breach of this Agreement; or (e) is disclosed under operation of law or pursuant to the request of a court or governmental body, except that the receiving Party shall disclose only such Information as is legally required and shall (i) use reasonable efforts to ensure the continued confidential treatment of any disclosed Information; and (ii) provide to the disclosing Party prompt written notice of each such legal requirement for disclosure, so that the disclosing Party may seek an appropriate protective order. Notwithstanding this Section 12.2, Customer shall be permitted to disclose the Confidential Information to its controlling shareholder and its affiliated companies for the purpose of pursuing group activities.

**12.3 Force Majeure.** A Party will not be responsible for delay in or impossibility of performance under this Agreement due to any *force majeure* or any other unforeseeable circumstances that are reasonably beyond the control of that Party. A party may terminate this Agreement (or part thereof) without any further liability by written notice if an event of Force Majeure affecting the other party continues for a period of one (1) month.

**12.4 Subcontracting.** Supplier shall have the right to subcontract any work to be performed hereunder provided that it has obtained the prior written agreement of Customer and provided further that Supplier remains primary liable for any work performed by a subcontractor and that any act or omission of a subcontractor shall be considered as an act or omission of Supplier hereunder.

**12.5 Assignment.** A Party will not assign, transfer, or otherwise dispose of its rights and obligations under this Agreement without the prior written consent of the other Party (such consent not to be unreasonably withheld), provided that Customer may so transfer its rights and/or obligations and/or delegate its duties under this Agreement to an Affiliate or a successor to all or part of its or an Affiliate's business without Supplier's consent.

**12.6 Severability.** If any provision of this Agreement is held by a court or tribunal of competent jurisdiction to be unenforceable, the remaining provisions of this Agreement will continue in full force.

**12.7 Relationship of Parties.** The relationship of the Parties is that of independent contractors, and each Party is solely responsible for its own actions. This Agreement does not establish an agency relationship, a partnership, or a joint venture between the Parties, and neither Party will have the power or capacity to bind the other Party or otherwise act on behalf of the other Party.

**12.8 Insurance.** Supplier shall have contracted an insurance policy concerning its obligations under this Agreement and undertakes to evidence payment of insurance premiums upon Customer's request.

**12.9 Additional Remedies.** Any remedies set forth herein shall be without prejudice to additional remedies available to Customer.

**12.10 No Waiver.** Failure or delay by the Parties in exercising any right under this Agreement will not constitute a waiver of that right.

**12.11 Compliance with Laws.** The Parties shall comply with all applicable laws, rules and regulations in connection with its activities and obligations under this Agreement.

**12.12 Entire Agreement.** This Agreement and the attached Statement(s) of Work is the entire agreement between the parties and supersedes all previous verbal or written proposals and agreements relating to the subject matter hereof. Any and all of Suppliers general conditions of sale are expressly excluded.

**12.13 Governing Law and Jurisdiction.** This Agreement and all matters regarding the interpretation and/or enforcement hereof, will be governed exclusively by the laws of the Commonwealth of Virginia. All disputes arising in connection with this Agreement will be submitted to the jurisdiction of the courts in Fairfax, Virginia.

Professional Services Agreement                                                               Page 4

Confidential

Case 1:07-cv-03600-PAC      Document 8-4      Filed 05/18/2007      Page 42 of 51

**EXHIBIT 10.12**

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above written by the undersigned authorized representatives of Supplier and Customer.

FOR SUPPLIER                                FOR CUSTOMER

By:   /s/Alan L. Krishnan _____          By:   /s/ Shmuel Ben Tov _____

Name:  Alan L. Krishnan                     Name:  Shmuel Ben Tov

Title:  Executive Vice President            Title:  Chief Executive Officer

**Professional Services Agreement**                          **Page 5**

**Confidential**

**Exhibit 10.14**

**Helios & Matheson**
**Ganga Griha**
**6-D Nungambakkam High Road**
**Chennai 600034**
**India**

March 26, 2007

Helios & Matheson North America Inc.
(formerly The A Consulting Team, Inc.)
200 Park Avenue South
Suite 901
New York, NY 10003

    Re:  Authorization to Use "Helios & Matheson" Name, related trademarks, service marks and service names (collectively, the "Helios & Matheson Intellectual Property Rights")

To Board of Directors:

    For good and valuable consideration, the sufficiency and receipt of which is hereby accepted and acknowledged, Helios & Matheson Information Technology Ltd., a corporation organized under the laws of India ("Helios & Matheson"), hereby grants Helios & Matheson North America Inc. (formerly The A Consulting Team, Inc.) (the "Company"), a New York Corporation and each of its subsidiaries a non-exclusive, worldwide right to use the Helios & Matheson Intellectual Property Rights on a royalty free basis.

    Helios & Matheson shall have the right to terminate the Company's right to use the Helios & Matheson Intellectual Rights upon each of the following events:

    (i)   the Company duly and properly effectuates a change of the Company's corporate name which change is not consented to or approved by Helios & Matheson.

    (ii)  the Company consummates a business combination or merger, pursuant to which the Company is not the surviving corporation, or the Company consummates a sale of all or substantially all of its assets without the consent or approval of Helios & Matheson.

Exhibit 10.14

Board of Directors
March 26, 2007
Page 2

    (iii)  the Company files or becomes a debtor subject to a bankruptcy proceeding which proceeding or filing was not commenced by Helios or Matheson or consented to by Helios & Matheson.

Subject to Helios & Matheson's right to terminate the Company's right to use the Helios & Matheson Intellectual Property Rights set forth in the preceding paragraph the Company shall have a perpetual right to use the Helios & Matheson Intellectual Property Rights.

This agreement contains the entire agreement between the Company and Helios & Matheson regarding the Helios & Matheson Intellectual Property Rights and this agreement supersedes any prior oral or written agreements or undertakings between the Company and Helios & Matheson regarding the Helios & Matheson Intellectual Property.

Very truly yours,

Helios & Matheson Information Technology Ltd.

By: /s/ V. Ramachandiran
      V. Ramachandiran
      Chairman

EXHIBIT 23.1

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We have issued our report dated February 24, 2005, accompanying the consolidated financial statements and Schedule II included in the Annual Report of Helios & Matheson North America Inc (formerly The A Consulting Team, Inc.)and its Subsidiaries on Form 10-K for the year ended December 31, 2006. We hereby consent to the incorporation by reference of said report in the Registration Statements of Helios & Matheson North America Inc (formerly The A Consulting Team, Inc.) and its Subsidiaries on Form S-3 (File No. 333-38330, effective June 1, 2000, File No. 333-42744, effective August 1, 2000, File No. 333-51084, effective December 1, 2000 and File No. 333-116227, effective June 23, 2004) and on Form S-8 (File No. 333-42145, effective December 12, 1997) as amended on June 24, 1998 and March 28, 2006 and on Form S-8(File No. 333- 133183, effective April 10, 2006).

GRANT THORNTON LLP
New York, New York
March 27, 2007

**EXHIBIT 23.2**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the Registration Statement (Nos. 333-38330, effective June 1, 2000, 333-42744, effective August 1, 2000, 333-51084, effective December 1, 2000 and 333-116227, effective on June 23, 2004) on Form S-3 and on Form S-8 (No. 333-42145, effective December 12, 1997 as amended on June 24, 1998 and on March 28, 2006) and Form S-8 (No. 333-133183, effective April 10, 2006) of Helios & Matheson North America Inc. and Subsidiaries of our report dated March 27, 2007 relating to our audits of the consolidated financial statements, and Schedule II, which appear in the Annual Report on Form 10-K of Helios & Matheson North America Inc. and Subsidiaries for the year ended December 31, 2006 and 2005.

Mercadien P.C., Certified Public Accountants
Hamilton, New Jersey
March 27, 2007

Case 1:07-cv-03600-PAC Document 8-4 Filed 05/18/2007 Page 48 of 51

Exhibit 31.1

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER

I, Shmuel BenTov, the principal executive officer of Helios & Matheson North America Inc., certify that:

1. I have reviewed this annual report on Form 10-K of Helios & Matheson North America Inc., the registrant;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. As the registrant's certifying officer I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

 a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to me by others within those entities, particularly during the period in which this report is being prepared;

 b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

 c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. As the registrant's certifying officer I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

 a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

 b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 29, 2007

/s/ Shmuel BenTov
Shmuel BenTov
Chairman, Chief Executive Officer and
President
(Principal Executive Officer)

Exhibit 31.2

## CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER

I, Salvatore M. Quadrino, the principal financial officer of Helios & Matheson North America Inc., certify that:

1. I have reviewed this annual report on Form 10-K of Helios & Matheson North America Inc., the registrant;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. As the registrant's certifying officer I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to me by others within those entities, particularly during the period in which this report is being prepared;

    b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. As the registrant's certifying officer I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 29, 2007

/s/ Salvatore M. Quadrino
Salvatore M. Quadrino
Chief Financial Officer
(Principal Financial Officer)

Exhibit 32.1

## CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the accompanying Annual Report on Form 10-K of Helios & Matheson North America Inc. for the year ended December 31, 2006, I, Shmuel BenTov, the principal executive officer of Helios & Matheson North America Inc., hereby certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

   (1)   such Annual Report on Form 10-K for the year ended December 31, 2006 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

   (2)   the information contained in such Annual Report on Form 10-K for the year ended December 31, 2006 fairly presents, in all material respects, the financial condition and results of operations of Helios & Matheson North America Inc., on a consolidated basis.

This written statement is being furnished to the Securities and Exchange Commission as an exhibit to such Form 10-K.

Date: March 29, 2007                      /s/ Shmuel BenTov
                                          Name: Shmuel BenTov
                                          Title:   Chairman, Chief Executive Officer
                                                and
                                                President
                                              (Principal Executive Officer)

A signed original of this written statement required by § 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

**EXHIBIT 32.2**

## CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the accompanying Annual Report on Form 10-K of Helios & Matheson North America Inc. for the year ended December 31, 2006, I, Salvatore M. Quadrino, the principal financial officer of Helios & Matheson North America Inc., hereby certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) such Annual Report on Form 10-K for the year ended December 31, 2006 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in such Annual Report on Form 10-K for the year ended December 31, 2006 fairly presents, in all material respects, the financial condition and results of operations of Helios & Matheson North America Inc., on a consolidated basis.

This written statement is being furnished to the Securities and Exchange Commission as an exhibit to such Form 10-K.

Date: March 29, 2007                                    /s/ Salvatore M. Quadrino
                                                       Name:  Salvatore M. Quadrino
                                                       Title:   Chief Financial Officer
                                                               (Principal Financial Officer)

A signed original of this written statement required by § 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.