UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------:

HELIOS & MATHESON NORTH
AMERICA, INC., f/k/a
THE A CONSULTING TEAM, INC.,

                 Plaintiff,

     -against-

VEGASOFT OY, A FINNISH
CORPORATION,

               Defendant.

---------------------------------------------------------------:

:     Crotty, J.

:     CIV. NO.: 07 CV 3600

---

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

---

SILLS CUMMIS EPSTEIN & GROSS, P.C.
One Rockefeller Plaza
New York, New York 10020
(212) 643-7000

**Attorneys for Defendant**

Marc S. Friedman, Esq.
John Carlson, Esq.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND FACTS ....................................................................................... 2

    A.    The First Distributor Agreement ................................................................ 2

    B.    The Second Distributor Agreement ........................................................... 4

    C.    The Termination Notice ............................................................................. 7

    D.    The Order To Show Cause .......................................................................... 7

    E.    The Hearing On Helios's Motion For Temporary Injunctive Relief .................... 8

ARGUMENT ...................................................................................................... 10

    HELIOS CANNOT SATISFY THE STANDARD FOR A  MANDATORY
    PRELIMINARY INJUNCTION .......................................................................... 10

        I.    Helios Has Failed To Show That It Is Likely To Suffer Irreparable
            Harm If Injunctive Relief Is Denied .......................................................... 11

        II.    Helios Has Failed to Show That It Is Clearly And Substantially
            Likely To Prevail On The Merits Of Its Causes of Action ...................... 14

    A.    First Cause Of Action For Permanent Injunction ................................. 14

    B.    Second Cause of Action For Breach of Contract ................................. 15

    C.    Third Cause Of Action For Tortious Interference .............................. 15

    D.    Fourth Cause Of Action For Declaratory Judgment/Reformation ........................ 18

        III.    Helios Cannot Show That It Will Suffer Severe Harm If An
            Injunction Does  Not Issue .......................................................................... 22

CONCLUSION .................................................................................................. 24

## TABLE OF AUTHORITIES

### FEDERAL CASES

Abdul Wali v. Coughlin, 754 F.2d 1015 (2d Cir. 1985)................................................10

Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312 (2d Cir. 1982) ....................................10

General Textile Printing & Processing Corp. v. Exprom torg International Corp., 862
    F.Supp. 1070 (S.D.N.Y. 1994)................................................11, 12

Henrietta D. v. Bloomberg, 331 F.3d 261 (2d Cir. 2003)................................................11

Klay v. United Healthgroup, Inc., 376 F.3d 1092 (11th Cir. 2004)................................................14

Larsen v. A.C. Carpenter, Inc., 620 F.Supp. 1084 (E.D.N.Y. 1985), aff'd, 800 F.2d 1128
    (2d Cir. 1986)................................................14

Lennon v. Seaman, 63 F.Supp.2d 428 (S.D.N.Y. 1999)................................................16

Levin v. Harleston, 966 F.2d 85 (2d Cir. 1992)................................................11

Net2Globe Intern. v. Time Warner Telecom of N.Y., 273 F.Supp.2d 436 (S.D.N.Y.
    2003) ................................................16

Norcom Electronics Corp. v. CIM USA Inc., 104 F.Supp.2d 198 (S.D.N.Y. 2000)...............10, 11

People For Ethical Treatment of Animals v. Giulani, 105 F.Supp.2d 294 (S.D.N.Y. 2000) ..10, 22

Polymer Technology Corp. v. Mimron, 37 F.3d 74 (2d Cir. 1994)................................................10

Special Event Entertainment v. Rockefeller Center, 458 F.Supp. 72 (S.D.N.Y. 1978) ................16

Spencer Trask Software and Info. v. RPost Intern., 190 F.Supp.2d 577 (S.D.N.Y. 2002)......10, 11

Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27 (2d Cir. 1995)...................11

Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775 (2d Cir. 1994) ................................................10

### STATE CASES

Amend v. Hurley, 293 N.Y. 587 (1944) ................................................19, 22

Chimart Associates v. Paul, 66 N.Y.2d 570, 498 N.Y.S.2d 344 (1986)................................19, 20, 21

George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 413 N.Y.S.2d 135
(1978).................................................................................................................20

Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 406 N.E.2d 445,
428 N.Y.S.2d 628 (1980).............................................................................17, 18

NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614, 664 N.E.2d 492,
641 N.Y.S.2d 581 (1996).....................................................................................16

Seebold v. Halmar Constr. Corp., 146 A.D.2d 886, 536 N.Y.S.2d 871 (3d Dep't 1989).............19

South Fork Broad. Corp. v. Fenton, 141 A.D.2d 312, 528 N.Y.S.2d 837 (1st Dep't), app.
dismissed, 73 N.Y.2d 809, 537 N.Y.S.2d 494 (1988) ................................19, 20

Wallace v. 600 Partners Co., 205 A.D.2d 202, 618 N.Y.S.2d 298 (1st Dep't 1994)....................20

William P. Pahl Equipment Corp. v. Kassis, 182 A.D.2d 22, 588 N.Y.S.2d 8 (1st Dep't
1992) .........................................................................................................19, 20

iii

Defendant, Vegasoft OY ("Defendant" or "Vegasoft"), respectfully submits this Memorandum of Law in opposition to the motion of plaintiff, Helios & Matheson North America, Inc. ("Plaintiff" or "Helios"), for a mandatory preliminary injunction requiring Vegasoft to continue to provide Plaintiff with a "password generator" each quarter during the pendency of this action.

## PRELIMINARY STATEMENT

Vegasoft exercised its contractual right to terminate its computer software Distributor Agreement with Helios. Helios does not challenge the termination notice. Instead, after waiting three more months, Helios brought this action effectively to continue the Distributor Agreement in perpetuity and to keep 50% of the renewal revenues for itself.

Helios cannot point to a single provision in the Distributor Agreement that gives it the right to renew any licenses after the Distributor Agreement is terminated. As a result, Helios retreats by asserting a claim for contract reformation, asking this Court to change the Distributor Agreement by inserting a new provision enabling it to grant renewals and collect the revenues. Simply stated, dissatisfied with the contract provision it drafted, Helios, under the guise of seeking an injunction, is asking this Court to rewrite the contract in its favor. The action is baseless and the injunction should be denied. Helios's remaining claims for a permanent injunction and tortious interference with contract are equally flawed.

In addition to the fatal flaws in its Verified Complaint which go directly to the probability of success, Helios cannot demonstrate that the denial of injunctive relief will result in immediate, irreparable harm to its business – the single most important factor in any application for an injunction. In short, Helios cannot meet any prong of the stringent test for mandatory injunctive relief and its motion should be denied.

## BACKGROUND FACTS[1]

Vegasoft is a small Finnish computer software developer, and Helios is a domestic corporation (formerly known as "The A Consulting Team, Inc.") engaged in many business activities, including marketing and distributing computer software products developed by a number of independent software developers including Vegasoft. (Karjalainen Dec. at ¶ 8). The parties have done business together for nearly sixteen years. (Id.).

### A.     The First Distributor Agreement

The undisputed facts show that the termination section of the Distributor Agreement at issue, which defines the parties' rights upon termination, was drafted by Helios, not Vegasoft.

In 1991, the parties entered into their first written Distributor Agreement ( the "First Distributor Agreement"), in which Helios agreed to market and license computer software (the "Software") developed by Vegasoft to third-party users (the "Licensed Users") in the United States, Canada, and Israel. (Id. at ¶ 10). Because Vegasoft had no prior experience doing business in the United States, it relied upon Helios to provide a draft of the Distributor Agreement and all of the attached schedules, which was then fine-tuned by the parties. (Id.).

In the First Distributor Agreement, the termination section (§ 19) was drafted by Helios and it was not changed by Vegasoft when it fine-tuned other sections of the agreement. (Id. at ¶ 11). This termination section continued in haec verba in the next Distributor Agreement discussed below, apart from the addition of a single provision that requires Helios to "[p]ay all amounts owing to VEGASOFT according this Agreement" on termination (§ 18[b][6]). (Id.).

---

[1]      The facts are set forth in the accompanying Declarations of Vegasoft's Chief Executive Officer, Matti Karjalainen, dated May 17, 2007 (the "Karjalainen Dec."), and Vegasoft's Chairman of the Board, Onni Kukkonen, dated May 17, 2007 (the "Kukkonen Dec."), and a Supplemental Declaration of Mr. Kukkonen, dated May 18, 2007 (the "Supp. Kukkonen Dec.").

The First Distributor Agreement provided that Helios would license the Software to Licensed Users for one year terms pursuant to an agreed standard form of "Software License Agreement" between Helios and the Licensed Users that was attached to the Distributor Agreement as Schedule "A". (Id. at ¶ 12; a complete copy of the First Distributor Agreement and Schedules, is annexed as Ex. A to the Karjalainen Dec.). The Software License Agreement contained a section entitled "Limitation Of Liability" which capped any damage claim against Helios by its licensees for breach of contract, and provided as follows:

> [Licensed User] agrees that except for liability for infringement of any UNITED STATES OF AMERICA patent of (sic) copyright, trade secret or other proprietary right, [Helios's] LIABILITY for damages, regardless of the form of action, is limited to the license fee received under this agreement.

> In no event will [Helios] be liable for any consequential damages, even if [Helios] has been advised of the possibility of such damages.

(Id. at ¶ 13). To facilitate the negotiation of Software License Agreements with potential users, Helios had the discretion and authority to deviate from the terms of the agreed standard form of Software License Agreement as necessary, and Helios did not consult with Vegasoft concerning the terms that Helios ultimately negotiated and agreed to. (Id. at ¶ 14).

The Software licenses were renewable by the Licensed Users on a year to year basis upon payment of a renewal fee. (Id. at ¶ 15). Vegasoft provided upgrades to the Software, and necessary instruction manuals and technical support, and Helios supported and maintained the Software as needed by the Licensed Users. (Id.). Vegasoft and Helios agreed to split the initial license fee and the annual renewal fees 50-50. (Id.).

In order to use the Software, each Licensed User was given a password when it entered into a Software License Agreement. (Id. at ¶ 16). The password was then changed on every anniversary date of the Software License Agreement. (Id.). As a matter of convenience,

3

Vegasoft provided Helios with a "password generator" that allowed Helios to create new passwords for Licensed Users at the time the Users renewed their Software licenses. (Id.).

### B.    The Second Distributor Agreement

In June of 2002, Onni Kukkonen of Vegasoft, sent a series of e-mails to Shmuel Bentov of Helios, concerning updates to the First Distributor Agreement.  (Kukkonen Dec. at ¶ 3; Karjalainen Dec. at ¶ 17. Copies of the e-mails that Mr. Kukkonen and Mr. Bentov exchanged are annexed as Ex. A to the Kukkonen Dec. and Ex. B to the Karjalainen Dec).

In his first e-mail, dated June 25, 2002, Mr. Kukkonen noted that the description of Vegasoft's Software products needed to be expanded to include new software products that had been developed during the 11 year period since the First Distributor Agreement was entered into, and further stated that he wanted to clearly define the level of customer support each company was responsible for under the Software License Agreement. (Kukkonen Dec. at ¶ 4; Karjalainen Dec. at ¶ 18).  At the time this exchange took place, Vegasoft was under pressure to decide whether to hire a support person at a salary of $80,000 to assist Vegasoft in providing software support to the Licensed Users, so it was important to Mr. Kukkonen to define each parties' area of responsibility to the Licensed Users. (Id.).  In an e-mail, dated June 26, 2002, Mr. Bentov agreed that the First Distributor Agreement needed to be updated. (Id.).

To speed up the process of revising the First Distributor Agreement, Mr. Kukkonen undertook to revise the First Distribution Agreement himself, to add "a more exact definition of the Level I tech support in section 12." (See, Mr. Kukkonen's e-mail, dated June [kesäkuuta] 26 13:04). (Kukkonen Dec. at ¶ 5; Karjalainen Dec. at ¶ 19).  Although Mr. Kukkonen sent several e-mails to Mr. Bentov requesting his comments to the proposed revisions, it was not until August 28, 2002, that Mr. Bentov sent his comments/"corrections" to the proposed revised Distributor Agreement. (See, Mr. Bentov's e-mail, dated August [elokuuta] 28, 2002 21:48). (Id.).

4

Mr. Kukkonen accepted all of Mr. Bentov's changes and sent Mr. Kukkonen a final version of the Second Distributor Agreement for execution. (See, Mr. Kukkonen's e-mail, dated August [elokuuta] 29, 2002 16:10). (Kukkonen Dec. at ¶ 6; Karjalainen Dec. at ¶ 20). (A copy of the Second Distributor Agreement is annexed as Ex. C to the Karjalainen Dec.).

A Comparison of the First Distributor Agreement and the Second Distributor Agreement reveals that the documents are substantially similar, and the differences in the two documents are not material to the issues before this Court. (Kukkonen Dec. at ¶ 7; Karjalainen Dec. at ¶ 21). No changes were suggested or made to the termination provision of the First Distributor Agreement, which had been drafted by Helios, apart from adding a provision that requires Helios to pay all amounts owing to Vegasoft when the Distributor Agreement is terminated. (Id.). No substantive changes were made to the Software License Agreement that was originally attached as Schedule A to the first Distributor Agreement. (Kukkonen Dec. at ¶ 8; Karjalainen Dec. at ¶ 22). (In fact, it appears that the only change in the form of Software License Agreement was changing the punctuation in the section entitled "LICENSE.") (Id.).[2]

Section 18(a) of the Second Distributor Agreement allows either party to terminate the Agreement without cause on 90 days written notice. (Kukkonen Dec. at ¶ 9; Karjalainen Dec. at ¶ 23). Once the Second Distributor Agreement terminated, Helios has no further right or authority under the Second Distributor Agreement to (i) contact Licensed Users concerning the software without Vegasoft's consent, (ii) renew Software licenses, or (iii) receive any monies when and if the Software licenses are renewed. (Id.). Vegasoft, on the other hand, has the right

---

[2]      Exhibit 2 to Mr. Quadrino's affidavit in support of its order to show cause consists of a chart that lists the names of all twenty-three Licensed Users, and copies of twenty-two of the twenty-three Software License Agreements. An inspection of the Software License Agreements reveals that all but two of the twenty-three Licensed Users entered into Software License Agreements prior to 2002. Since there is no dispute that Helios drafted the First Distributor Agreement and Schedules, as well as all of the various Software License Agreements, the question of who was responsible for drafting the Second Distributor Agreement in 2002, is irrelevant to any issue in this case.

5

to contact the Licensed Users of Vegasoft's Software directly, support and maintain the software as needed, and renew their Software licenses. (Id.).

Termination of the Second Distributor Agreement has no effect upon unexpired Software License Agreements between Helios and Licensed Users. (Kukkonen Dec. at ¶ 10; Karjalainen Dec. at ¶ 24). Those Agreements remain in full force and effect until they expire according to their terms or are renewed by the Licensed Users with Vegasoft, or a corporation designated by Vegasoft to succeed Helios. (Id.). Until such time, Helios and Vegasoft continue to provide service to the Licensed Users. (Id.).

At no time did Vegasoft agree with Helios during their negotiation of the First Distributor Agreement or the Second Distributor Agreement that following the termination of either version of the Distributor Agreement, Helios would have the right to (i) renew Software licenses for all of the Licensed Users then extant, or any sub-set of those Licensed Users, or (ii) collect annual renewal fees. (Kukkonen Dec. at ¶ 11). Moreover, there was no discussion between the parties during the negotiation of either version of the Distributor Agreement about the possibility that some Licensed Users might not be able to contract directly with Vegasoft. (Id.). This is why the Distributor Agreement does not contain the language that Helios is asking this Court to insert.

Indeed, as recently as May 10, 2007, the return date of Helios's order to show cause, Vegasoft was unaware of exactly which Licensed Users, if any, had restrictions upon their ability to enter into Software License Agreements, and Helios never advised Vegasoft that such restrictions existed.[3] (Id. at ¶ 12; Karjalainen Dec. at ¶ 26) As a result, any suggestion that the parties agreed during their negotiation of either version of the Distributor Agreement to allow

---

[3]     On May 11, 2007, John Carlson, Esq., counsel for Vegasoft, wrote and faxed a letter to counsel for Helios requesting a list of Licensed Users who Helios maintains are allegedly not "permitted" to renew their Software licenses with a foreign corporation. That letter was never replied to.

Helios to continue to renew Software licenses after the Distributor Agreement was terminated, is false. (Id.).

Moreover, Section 19(a) of the Second Distributor Agreement contains an integration clause that provides that "[t]his Agreement states the entire agreement between the parties and supersedes all agreements and proposals, oral or written, and all other communications between the parties to this Agreement." (Karjalainen Dec. at ¶ 27). Under the Parol Evidence Rule, the Court cannot add to the parties' written agreement, as Helios wants.

### C.    The Termination Notice

On February 9, 2007, Vegasoft gave written notice to Helios that it was terminating the Second Distributor Agreement, effective as of May 10, 2007 (the "Termination Date"). (Id. at ¶ 28). It is undisputed that this notice was permitted and effective under the terms of the Second Distributor Agreement. (Id.).

On February 12, 2007, Vegasoft sent a follow-up e-mail to Helios requesting that Helios cease using the password generator, and destroy all files containing Software passwords. (Id. at ¶ 29). Helios never raised an issue concerning this request until Helios served its order to show cause on the eve of the Termination Date. (Id.).

### D.    The Order To Show Cause

On May 2, 2007, Helios commenced this action by filing a Verified Complaint (the "Complaint") in New York Supreme Court, New York County, together with an order to show cause and a supporting affidavit from Helios's Chief Financial Officer, Salvatore Quadrino. Helios seeks, inter alia, a temporary and a preliminary mandatory injunction compelling Vegasoft to provide Helios with a new password generator to enable it to renew Software licenses after the May 10, 2007 Termination Date.

7

Helios's Complaint pleads four causes of action for (i) permanent injunctive relief; (ii) breach of contract; (iii) tortious interference with contractual relations; and (iv) contract reformation. Helios's theory of the case is that the twenty-three current the Licensed Users are really Helios's customers, and that following termination, Helios continues as a de facto distributor with the right to renew the Software licenses; continue to collect annual renewal fees; and remit a share of the proceeds to Vegasoft for an unspecified period of time. Under Helios's view of the facts, any direct contact between Vegasoft and the Licensed Users concerning the fact of the termination of the Second Distributor Agreement gives rise to a cause of action for tortious interference with Helios's contractual relations with the Licensed Users. This argument flies in the face of the provisions in Section 18 governing termination.

To get around the fact that the terms of the Second Distributor Agreement do not support Helios's argument, and certainly not its alleged right to new passwords, Helios's final cause of action seeks reformation of the Second Distributor Agreement to fill in the alleged "missing" terms. In effect, Helios is asking the Court to rewrite the agreement to suit Helios's purposes.

On May 7, 2007, Vegasoft removed the action to the District Court. On May 10, 2007, Vegasoft served and filed a Declaration from Mr. Karjalainen, dated May 9, 2007, and a letter brief, dated May 10, 2007, in opposition to Helios's motion for temporary injunctive relief.

E.    **The Hearing On Helios's Motion For Temporary Injunctive Relief**

On May 11, 2007, a hearing was held before the Honorable Paul A. Crotty on Helios's motion for a temporary mandatory injunction. Counsel for Vegasoft argued that Vegasoft planned to renew all of the Software licenses with the Licensed Users, and neither Helios nor the Licensed Users would be harmed. Helios's counsel argued that even if Vegasoft offered to renew all of the Software licenses, Helios would still suffer "irreparable" harm because certain unidentified Licensed Users cannot enter into contracts with foreign corporations such as

8

Vegasoft, and those users <u>might</u> sue Helios for breach of contract if their Software Licenses are not renewed by Helios at some future point in time. Significantly, counsel admitted that no Licensed User has declared a breach under any Software License Agreement. In addition, counsel failed to specifically identify which Licensed Users fell into that category, and further failed to discuss how the "Limitation Of Liability" provisions contained in every one of the Software License Agreements would affect these speculative, contingent/inchoate claims.

The Court denied Helios's motion for a temporary mandatory injunction and set the matter down for an evidentiary hearing on May 21, 2007.

## ARGUMENT

## HELIOS CANNOT SATISFY THE STANDARD FOR A
## MANDATORY PRELIMINARY INJUNCTION

In the Second Circuit, the standard for granting a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure is well settled: "a preliminary injunction can only be granted on a showing of irreparable harm, and 'either (1) a likelihood of success on the merits of [the] case or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in [] favor [of the moving party]." Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 779-80 (2d Cir. 1994), citing, Polymer Technology Corp. v. Mimron, 37 F.3d 74, 77-8 (2d Cir. 1994)(quoting Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 314-5 (2d Cir. 1982)). See also, Spencer Trask Software and Info. v. RPost Intern., 190 F.Supp.2d 577, 580 (S.D.N.Y. 2002).

Where a party seeks a mandatory injunction, a heightened burden attaches, and the injunction may issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985). See also, People For Ethical Treatment of Animals v. Giulani, 105 F.Supp.2d 294, 303 (S.D.N.Y. 2000); Norcom Electronics Corp. v. CIM USA Inc., 104 F.Supp.2d 198, 207 (S.D.N.Y. 2000). It has been observed that Courts in this Circuit have shown greater reluctance to issue mandatory injunctions than prohibitory injunctions. Abdul Wali, 754 F.2d at 1025.

As will be shown below, Helios cannot meet the stringent test for mandatory injunctive relief

I.     **Helios Has Failed To Show That It Is *Likely* To Suffer Irreparable Harm If Injunctive Relief Is Denied**

A showing of irreparable harm is "the most important prerequisite for the issuance of a preliminary injunction." Norcom Electronics Corp., 104 F.Supp.2d at 209. The movant is required to show not a mere *possibility* of irreparable harm, but that it is *likely* to suffer irreparable harm if equitable relief is denied. Spencer Trask Software and Info., 190 F.Supp.2d at 581. A party seeking injunctive relief has the burden of demonstrating that it will suffer real and imminent, not remote, irreparable harm in the absence of a remedy, and that such harm is not capable of being fully remedied by money damages. Id.; Henrietta D. v. Bloomberg, 331 F.3d 261, 290 (2d Cir. 2003), citing, Levin v. Harleston, 966 F.2d 85, 90 (2d Cir. 1992).

The Second Circuit has consistently stressed that in order to be deemed "irreparable," the harm alleged by the movant must require a remedy beyond "mere monetary damages." General Textile Printing & Processing Corp. v. Exprom torg International Corp., 862 F.Supp. 1070, 1075 (S.D.N.Y. 1994). "A monetary loss will not suffice unless the movant produces evidence of damage that cannot be rectified by financial compensation." Id. "Accordingly, although the loss of an ongoing business, a relatively unique product, or significant good will may give rise to irreparable harm, the loss of only a part of a business will not support injunctive relief if the loss is entirely compensable in monetary damages." Norcom Electronics Corp., 104 F.Supp.2d at 209; Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 34 (2d Cir. 1995).

Injunctive relief is rarely granted in actions for breach of contract because the usual remedy is a claim for monetary damages:

> While the Court has the discretion to permit injunctive relief for breach of contract, the classic remedy for breach of contract is an action at law for damages. If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable harm may be found as a matter of law. Rosenfeld v. W.B. Saunders, 728 F. Supp. 236, 244

11

(S.D.N.Y. 1990) (citations and quotations omitted), aff'd without op., 923 F.2d 845, (2d Cir. 1990).

General Textile Printing & Processing Corp. v. Expromtorg International Corp., 862 F.Supp. 1070, 1075 (S.D.N.Y. 1994).

In this case, Helios based its order to show cause upon its own groundless speculation that Vegasoft intended to refuse to renew the Software licenses of Licensed Users. Helios erroneously inferred that because Vegasoft exercised its contractual right to terminate the Distributor Agreement and to refuse to provide Helios with any further password generators, Vegasoft intended to deprive the Licensed Users of the opportunity to renew their Software licenses. Nothing could be further from the truth.

Users of Vegasoft Software will continue to use the software seamlessly. Vegasoft will renew any and all Software licenses that come up for renewal during the pendency of this action, will provide the Licensed Users with the passwords they need in order to utilize the licensed Software, and will provide the maintenance, Software updates and manuals the users need to operate seamlessly. By so doing, the status quo - the Licensed Users' continued use of Vegasoft Software - will be maintained. No customer will be irreparably injured.

In response to this argument, Helios's counsel made the following argument at the TRO hearing: certain unnamed Licensed Users have a perpetual right under the Software License Agreements to renew their Software licenses, but are unable, as a matter of law, to contract directly with Vegasoft because Vegasoft is a foreign corporation; the Software License Agreements were drafted by Vegasoft, and Helios was forced to use these Agreements; unless Helios renews these unidentified Software License Agreements, these unnamed Licensed Users may – in the future – sue Helios for damages, and Helios will suffer "irreparable" harm at that time. Significantly, counsel for Helios admitted that none of the Licensed Users have stated that

12

they will declare a breach if Helios does not renew their Software licenses, and counsel could not explain why an award of monetary damages in this case would not fully compensate Helios if it were sued for breach of contract by a Licensed User.

In fact, Helios's argument is fatally flawed for the following reasons:

- Helios failed to demonstrate that it is likely to suffer immediate, irreparable harm. Instead, Helios speculates that it <u>might</u> be sued by a Licensed User some day in the future, even though Vegasoft is indisputably ready, willing and able to renew all of the Software licenses. This mere speculation does not meet the Second Circuit's standard for demonstrating immediate, irreparable harm.

- Every Software License Agreement contains a provision that limits the Licensed User's damage claims against Helios to either the annual renewal fee or the license fee paid under that particular Software License Agreement. These provisions cap and liquidate Helios's exposure to damage claims under <u>every</u> Software License Agreement, and directly undercut Helios's argument that it will suffer <u>irreparable</u> harm that cannot be compensated with money damages if Helios does not have the right to renew the Software License Agreements.

- Helios – not Vegasoft - negotiated Software License Agreements with each Licensed User, based upon a form that <u>Helios</u> drafted in 1991. In addition, the final terms and provisions contained in the Software License Agreements were determined by Helios. For example, in its contract with Ford Motor Company, Helios agreed that the term of the license is "Perpetual." This provision is <u>not</u> found in the exemplar Software License Agreement that was attached to either version of the Distribution Agreement, or in any other Software License Agreement. This provision is unique to Helios's contract with Ford <u>and was</u> <u>negotiated by Helios</u>. In addition, two of the Software License Agreements were used by Helios in connection with products from another Software developer (Cogito Ltd.) and Vegasoft's products were added as an addendum. Thus, contrary to the melodramatic argument made by Helios during oral argument, Vegasoft did <u>not</u> unilaterally draft all of the Software License Agreements and foist them on to Helios to its present detriment. Helios is entirely responsible for this supposed "problem".

- On May 15, 2007, Vegasoft contacted 14 Licensed Users concerning renewing their Software licenses and to inquire whether there are any legal impediments to renewal. To the extent that a Licensed User cannot contract directly with Vegasoft, Vegasoft will seek to work with that Licensed User to accommodate its needs and insure that there is no disruption in its ability to renew its Software license.

13

Since Helios cannot meet its burden of showing that it is *likely* it will be irreparably harmed in the absence of a mandatory injunction, there is no need for emergent relief, and Helios's motion should be denied.

## II. Helios Has Failed to Show That It Is Clearly And Substantially Likely To Prevail On The Merits Of Its Causes of Action

Helios pled four meritless causes of action in its Complaint, and cannot demonstrate that it is clearly likely to prevail on any of them. In addition, all four of these causes of action are vulnerable to immediate dismissal.[4]

## B. First Cause Of Action For Permanent Injunction

For its First Cause of Action, Helios purports to plead a claim for a permanent injunction directing Vegasoft to provide the password generator for the renewal of existing Software licenses. (See, Complaint, ¶¶ 1-10). In fact, no such cause of action exists as a matter of law. An injunction is a remedy that is available only after a party makes a showing that some independent legal right is being infringed. As the Eleventh Circuit states, "any motion or suit for a traditional injunction must be predicated upon a cause of action, such as nuisance, trespass, the First Amendment, etc., regarding which a plaintiff must show a likelihood or actuality of success on the merits. There is no such thing as a suit for a traditional injunction in the abstract. For a traditional injunction to be even theoretically possible, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6)." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004). Thus, Helios's First Cause of Action should be regarded as nothing more than a derivative prayer for permanent injunctive relief, which seeks a remedy where there is no right.

---

[4]       Although the Distributor Agreement does not specify the law that governs the Agreement, Vegasoft has applied New York law for purposes of its analysis of Helios's likelihood of success on the merits. This Court may apply New York law under the principle that consent to use a forum's law is sufficient to establish choice of law. See, Larsen v. A.C. Carpenter, Inc., 620 F.Supp. 1084, 1103 (E.D.N.Y. 1985), aff'd, 800 F.2d 1128 (2d Cir. 1986).

### C.    Second Cause of Action For Breach of Contract

In its Second Cause of Action for breach of contract, Helios alleges in substance that Vegasoft breached the Distributor Agreement by failing to provide Helios with a password generator. (See, Complaint ¶ 12).  In order to prevail on this cause of action, Helios must demonstrate that such an obligation actually exists within the four corners of the Agreement.  In fact, no such provision exists, and Helios concedes as much in its Fourth Cause of Action where it alleges as follows: "The parties herein failed to specify the continued obligation of [Vegasoft] to provide the password generator for annual license renewals for existing [Licensed Users] in the event of a termination of the Distributor Agreement." (See, Complaint ¶ 20).  Since Helios concedes that the Distributor Agreement does not require that Vegasoft provide Helios with the password generator following its termination, Helios cannot establish that it is likely to succeed on the merits of its Second Cause of Action for breach of contract.

### D.    Third Cause Of Action For Tortious Interference

For its Third Cause of Action, Helios alleges that Vegasoft contacted the Licensed Users to inform them that Vegasoft "was terminating its Distributor Agreement with [Helios]" and advised them that Vegasoft would inform them "about support arrangements after May 10, 2007." (See, Complaint ¶ 8).  Helios alleges that this "contact" constituted a "tortious interference with the contracts between [Helios] and the [Licensed Users]." (Id. at ¶ 17).  These allegations fail to state a claim for relief, and Helios cannot demonstrate that it is clearly likely to succeed on the merits.

Under New York law, the elements of a claim for tortious interference with existing contractual relations are as follows:  (1) a valid contract between plaintiff and a third-party; (2) the defendant's knowledge of that contract; (3) defendant's intentional interference with that contract without reasonable justification or excuse resulting in a breach of contract; and (4)

15

damages resulting from the breach.  See e.g., Net2Globe Intern. v. Time Warner Telecom of N.Y., 273 F.Supp.2d 436, 461-1 (S.D.N.Y. 2003); Special Event Entertainment v. Rockefeller Center, 458 F.Supp. 72, 78 (S.D.N.Y. 1978).  The Court of Appeals has stated that this cause of action requires an actual breach.  Lennon v. Seaman, 63 F.Supp.2d 428, 433 (S.D.N.Y. 1999), citing, NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614, 620, 664 N.E.2d 492, 641 N.Y.S.2d 581 (1996).  "In addition, courts have required plaintiff to show that but for the unlawful actions of defendant the contract would have been performed."  Special Event Entertainment, 458 F.Supp. at 78.

Helios alleges that it has contracts with the Licensed Users, (Complaint at ¶ 4), and that Vegasoft contacted the Licensed Users by e-mail to inform them that Vegasoft "was terminating the Distributor Agreement with TACT (now HELIOS) and, inter alia, advising HELIOS' CLIENTS that it would 'later inform you about support arrangements after May 10, 2007.'" (Id. at ¶¶ 8, 16, 17).  Helios alleges that Vegasoft's alleged contact with the Licensed Users "constitutes a tortious interference with the contracts between HELIOS and the CLIENTS." (Id. at ¶18).  Nowhere does Helios allege that Vegasoft induced any of the Licensed Users to breach their Licensed Software Agreements with Helios, or that Helios suffered damages.  These omissions are fatal to Helios' claim for tortious interference.  Moreover, in light of the Termination Notice whose validity is unquestioned, Vegasoft had ample justification for contacting Software customers to ensure their continued use of the Vegasoft Software without interruption.

In Lennon v. Seaman, 63 F.Supp.2d 428 (S.D.N.Y. 1999), plaintiff, Yoko Ono Lennon, commenced an action against defendant, Frederic Seaman, who had been an employee of Ms. Lennon's household for a number of years.  At the center of the dispute between the parties were

16

photographs taken by the defendant of the Lennons during his time as an employee of the Lennons' that each party claimed ownership to.

Many years after Mr. Seaman ceased working for Ms. Lennon, she entered into a contract with Capital Records, Inc. ("Capital") to release a box set of her late husband John Lennon's released and unreleased works, which included certain photographs of Mr. Lennon. Mr. Seaman sent a letter to Capital claiming that he owned the copyright in one of the photos that was to be included in the box set. Plaintiff's complaint against Mr. Seaman included a claim that Mr. Seaman tortiously interfered with Ms. Lennon's existing contract with Capital.

Mr. Seaman moved to dismiss Ms. Lennon's claim for tortious interference on the grounds that it failed to state a claim for relief because the plaintiff failed to allege that Mr. Seaman induced Capital to breach its contract with Ms. Lennon, or otherwise rendered performance under the Capital contract impossible. Plaintiff opposed the motion to dismiss, arguing that even "where there is no breach, a plaintiff can still maintain a cause of action by alleging 'culpable conduct' or 'wrongful means' on the part of the defendant," citing, NBT Bancorp Inc. v. Fleet Norstar, infra, and Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183 191, 406 N.E.2d 445, 428 N.Y.S.2d 628 (1980).

The District Court rejected Ms. Ono's argument that it was not necessary to allege a breach of contract, stating as follows:

> The plaintiff has merged two causes of action – tortious interference with contract and tortious interference with prospective contract or business relations. The former requires an allegation of an actual breach, and the latter requires a showing of "wrongful means." See NBT, 87 N.Y.2d at 620-24, 664 N.E.2d 492, 641 N.Y.S.2d 581; Guard-Life, 50 N.Y.2d at 190-92, 406 N.E.2d 445, 428 N.Y.S.2d 628.
>
> The plaintiff has alleged tortious interference with an existing contract, rather than a prospective contract. Lacking an actual breach, the plaintiff attempts to fill the void with allegations of

17

"wrongful means," a requirement under causes of action relating to interference with prospective contracts. In light of both the Court of Appeals' clear statement that tortious interference with contract requires a showing of actual breach, and the Second Circuit's demonstrated reluctance to find that New York courts would recognize exceptions to the rule requiring "actual breach, *see D'Andrea*, [146 F.3d at 63, 66 (2d Cir. 1998)], we decline to hold that an allegation of "wrongful means" can substitute for an allegation of actual breach in a claim for tortious interference with an existing contract claim. Thus, plaintiff's ninth cause of action is dismissed.

Id. at 433-4.

In the absence of allegations that Vegasoft induced or procured an actual breach of contract, and that Helios suffered actual damages – supported by factual evidence – Helios cannot demonstrate that it is likely to succeed on its cause of action for tortious interference. To quote John Lennon, it is not enough to "Imagine" a contract breach!

Finally, there is no nexus or connection between the Third Cause of Action seeking monetary damages for tortious interference with Helios's contractual relations, and Helios's motion for a mandatory injunction compelling Vegasoft to provide the password generator. One has nothing to do with the other. Even assuming that Helios could make a prima facie showing of its entitlement to relief under this cause of action – which it cannot – such a showing would not entitle Helios to a mandatory injunction compelling Vegasoft to provide Helios with a password generator since such an injunctive remedy has no relationship to the claim for tortious interference. As a result, Helios's likelihood of success (which is non-existent) as to its Third Cause of Action has no bearing on its motion for an injunction.

**E.    Fourth Cause Of Action For Declaratory Judgment/Reformation**

For its Fourth Cause of Action, Helios joins a cause of action for declaratory judgment with a cause of action for contract reformation, and seeks declaratory judgment reforming the Distributor Agreement to require Vegasoft to continue to provide the password generator to

18

Helios. (Complaint at ¶¶ 20 – 22). Under New York law, reformation of a contract may be granted in only two circumstances: where the parties to the contract were <u>mutually</u> mistaken as to its actual terms, or where one party was unilaterally mistaken regarding the contract's requirements due to fraud or fraudulent concealment of the other party. <u>Chimart Associates v. Paul</u>, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 347 (1986). New York Courts have sharply limited the equitable remedy of reformation because of the danger that a party to a contract will falsely try to modify it to avoid terms that it may consider disadvantageous. (<u>Id.</u>) Reformation is <u>not</u> a mechanism for interjecting terms or provisions that were not agreed upon, or were suggested by one party but rejected by the other. <u>William P. Pahl Equipment Corp. v. Kassis</u>, 182 A.D.2d 22, 29, 588 N.Y.S.2d 8, 10-11 (1st Dep't 1992).

The burden on the party seeking reformation is a heavy one since it is presumed that a deliberately prepared and executed written instrument accurately reflects the true intention of the parties. As the Court of Appeals stated, "[r]eformation may not be granted upon a probability nor even upon a mere preponderance of evidence, but only upon a certainty of error … nor may [a party] secure reformation merely upon a showing that he or his attorney made a mistake." <u>Amend v. Hurley</u>, 293 N.Y. 587, 595 (1944). <u>See also</u>, <u>Seebold v. Halmar Constr. Corp.</u>, 146 A.D.2d 886, 887, 536 N.Y.S.2d 871, 872 (3d Dep't 1989)("clear and convincing" evidence); <u>South Fork Broad. Corp. v. Fenton</u>, 141 A.D.2d 312, 314, 528 N.Y.S.2d 837, 839 (1st Dep't 1988), <u>app. dismissed</u>, 73 N.Y.2d 809, 537 N.Y.S.2d 494 (1988).

The courts have therefore "required a party opposing a pretrial motion to dismiss a reformation claim to tender a 'high level' of proof in evidentiary form." <u>Chimart</u>, 66 N.Y.2d at 574, 498 N.Y.S.2d at 347, <u>citing</u> <u>Sagan v. Sagan</u>, 53 N.Y.2d 635, 637, 438 N.Y.S.2d 782, 783 (1981).

19

Mutual mistakes arises when "the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." Chimart, 66 N.Y. 2d at 573, 498 N.Y.S.2d at 347. Reformation of a written instrument has therefore been granted where it is shown that the parties came to an understanding, but in reducing it to writing, through mutual mistake, the parties omitted a provision they had agreed upon or inserted one that was not agreed upon. William P. Pahl Equipment Corp., 182 A.D.2d at 29, 588 N.Y.S.2d at 10-11. Thus, a sine qua non of a claim for mutual mistake is proof that the mistake was mutual. Where the documentary and testimonial evidence establish that any alleged mistake was unilateral, a claim for mutual mistake will not lie. Chimart, 66 N.Y.2d at 575, 498 N.Y.S.2d at 348; George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 219, 413 N.Y.S.2d 135, 139 (1978).

Moreover, "where a written agreement between sophisticated, counseled businessman dealing at arm's length is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that, owing to a mutual mistake, the writing did not express his or her understanding of the agreement." Wallace v. 600 Partners Co., 205 A.D.2d 202, 207, 618 N.Y.S.2d 298, 301-2 (1st Dep't 1994); South Fork Broad. Corp. v. Fenton, 141 A.D.2d 312, 314, 528 N.Y.S.2d 837, 839 (1st Dep't 1988).

In Chimart, the plaintiff purchased a 22% interest in a limited partnership that owned and operated a building in Chicago. At the closing of the transaction, defendant signed a letter agreement drafted by plaintiff's attorneys that contained the following paragraph:

> In order to induce you [plaintiff] to purchase the interest, and subject to your assignment to me [defendant] of your right to receive certain cash distributions from the Partnership, as described below, I agree to pay you, on November 23, 1982, the amount, if any, by which (A) $1,320,000 exceeds (B) the sum of the cash distributions to you from the Partnership on account of the Interest through November 20, 1982 (such amount being the 'Guarantee Payment'). If a Guarantee Payment is not paid on or before November 23, 1982, I also agree to pay interest on such Guarantee Payment from November 23, 1980 to the date such

> payment is actually made, at a rate per annum equal to the prime rate charged
> from time to time by Chemical Bank for 90-day unsecured loans to commercial
> borrowers of the highest credit rating plus one percent."

66 N.Y.2d at 571-2, 498 N.Y.S.2d at 346.

Plaintiff did not receive cash distributions from the limited partnership, which triggered defendant's obligation to make payment. After defendant failed to make the payment, plaintiff commenced an action and moved for summary judgment. Defendant opposed the motion, arguing that the letter agreement was ambiguous, and cross-moved to amend his answer to add a claim for reformation based upon mutual mistake and fraud. The lower court denied plaintiff's summary judgment motion, and the Appellate Division reversed. In affirming the Appellate Division, the Court of Appeals stated, as follows:

> First, the contract at issue is part of a multimillion dollar transaction involving
> sophisticated, counseled parties dealing at arm's length (*cf. Citibank v Plapinger,
> 66 N.Y.2d 90, 95*). Second, the language of the agreement was plain and
> unambiguous, and by [defendant's] own admission he failed to read the
> agreement. Crucially, there is no unequivocal evidence of mutual mistake or
> fraud.
>
> As to mutual mistake, [defendant] sets forth no basis for his contention that both
> parties reached an agreement other than that contained in the writing. His
> affidavit contains no specific claim that both parties agreed that [defendant] could
> pay only interest and in fact strongly suggests that the mistake was not mutual.
> The affidavit of [plaintiff's] attorney, by contrast, squarely addresses the point:
> "Whether or not defendant signed the Agreement under such a mistaken
> impression, I can state categorically that [plaintiff] did not labor under the same
> mistaken impression. As noted above, I played a key role in helping [plaintiff] to
> negotiate the Agreement. I therefore have direct knowledge of the facts to which
> I am testifying. Without doubt, the Agreement's words reflected exactly what I
> intended them to reflect. Otherwise, [plaintiff] would not have signed the
> Agreement. There could have been no mistake on the part of [plaintiff], because
> the words of the Agreement are plain and unambiguous." Under such
> circumstances, [defendant] was required - - and failed - - to come forward with
> something more than his own conclusory assertion that mistake existed.

66 N.Y.2d at 574-5, 498 N.Y.S.2d at 347.

21

In this case, there are no factual allegations of mutual mistake, or unilateral mistake by Helios as result of fraud or fraudulent concealment on the part of Vegasoft. As the <u>Karjalainen Dec.</u> makes clear Vegasoft never agreed that after the termination of the Distributor Agreement Helios could continue to renew the Software licenses and share in the renewal fees. In the absence of factual allegations that satisfy the stringent standard fixed by the Court of Appeals in <u>Amend v. Hurley</u>, Helios cannot meet its burden of demonstrating that it is substantially likely to succeed on the merits of its Fourth Cause of Action for contract reformation.

### III.    Helios Cannot Show That It Will Suffer Severe Harm If An Injunction Does Not Issue

Where a movant seeks a mandatory injunction, "the balance of harms test <u>per se</u> is inapplicable because such an injunction shall not issue absent a showing of clear likelihood of success on the merits or of 'extreme damage' that will result from a denial of the requested preliminary injunction." <u>People For Ethical Treatment of Animals v. Giuliani</u>, 105 F.Supp.2d 294, 335 (S.D.N.Y. 2000), <u>citing</u> <u>Tom Doherty Assocs., Inc. v. Saban Entertainment</u>, 60 F.3d 27, 34 (2d Cir. 1995). Rather than merely assessing in whose favor the balance tips, the Court applies a <u>higher</u> standard in considering the extent of harm movant may suffer absent an injunction in order to ascertain whether such harm is severe enough to warrant an injunction even absent a showing of substantial likelihood of success on the merits. (<u>Id.</u>)

In this case, Helios will suffer <u>no</u> irreparable harm if its motion for an injunction is denied since Vegasoft intends to renew the Software licenses. In the unlikely event that sometime in the future a Licensed User commences an action against Helios for breach of contract on the grounds that Helios is unable to renew a Software license because of the termination of the Distributor Agreement, any damages flowing from such a breach are <u>capped</u> by the "Limitation of Liability" provisions contained in the Software License Agreements.

22

In his affidavit, dated May 17, 2007, Mr. Bentov (the "Bentov Afd.") claims that the termination of the Distributor Agreement "is a substantial financial setback and hardship for HELIOS." (Bentov Afd. at ¶ 4.)  In fact Helios's Form 10-K for the fiscal year ended December 31, 2006, reveals that Helios's business relationship with Vegasoft, and the revenue Helios derives from that relationship are insignificant to Helios's business.  (Supp. Kukkonen Dec. at ¶ 4; a copy of the Form 10-K is attached as Exhibit A thereto.)

On page 2 and 3 of its Form 10-K, Helios describes its operations in detail.  Under the heading "Consulting, T&M, Projects, Outsourcing", Helios states that it derives over 90% of its revenues from "a wide range of IT consulting services, including technology infrastructure advisory services and systems architecture design for Fortune 1000 companies and other large organizations." (Id. at ¶ 5).

By contrast, under the heading "Software", Helios states as follows:

> [Helios] markets and distributes a number of software products developed by independent software developers. The Company believes its relationships with over 70 software clients throughout the country provide opportunities for the delivery of additional consulting and training services. The software products offered by [Helios] are developed in the United States, England and Finland and marketed primarily through trade shows, direct mail, telemarketing, client presentations and referrals. Revenue from the sale of software is ancillary to the Company's total revenues. (Emphasis added).

(Id. at ¶ 6)

On page 13 of its Form 10-K, Helios indicates that "[r]evenues from the sale of software licenses are recognized upon delivery of the software to a customer, because future obligations associated with such revenue are insignificant.  The Company views software sales as ancillary to its core consulting services business." (Emphasis added). (Id. at ¶ 7).

23

For the fiscal year ended December 31, 2006, Helios had gross revenues of $24.9 million. (Id. at ¶ 8; Form 10-K at F-5). By contrast, Mr. Bentov indicates that license renewals from Vegasoft Software generated in excess of $300K, or slightly in excess of 1.25% of Helios's gross revenues. (Bentov Afd. ¶ 4). Clearly, Mr. Bentov's claim in his affidavit that the termination of the Distributor Agreement is a "substantial financial setback" for Helios is a gross distortion, and was made solely to imply that his company will suffer great harm if an injunction is not entered. In fact, the latest Form 10-K reveals just how little financial impact the termination of the Distributor Agreement will have upon this "ancillary" part of Helios's business.

Since Helios cannot demonstrate that it will suffer severe and irreparable harm if its motion for a preliminary mandatory injunction is denied, it is not entitled to such relief.

## CONCLUSION

For all the reasons set forth above, it is respectfully requested that this Court deny, in all respects, the motion of plaintiff, Helios & Matheson North America, Inc., for a mandatory preliminary injunction, and grant to defendant, Vegasoft OY, such other and further relief as to the Court seems just and proper.

Dated: New York, New York
       May 18, 2007

                                    Respectfully submitted,

                                    SILLS CUMMIS EPSTEIN & GROSS, P.C.
                                    Attorneys for Defendant, Vegasoft OY

                                    By: _Marc S. Friedman_
                                        Marc S. Friedman, Esq. (MF8192)
                                        John Carlson (JC8183)
                                        One Rockefeller Plaza
                                        New York, New York 10020
                                        (212) 704-6000

24